## T. R. WILLIAMS v. H. MURPHY AND OTHERS.

1. On the 7th of March, 1861, judgment *in personam* and also a foreclosure decree were rendered on a note given for land. No execution on the judgment, or order of sale on the decree, was sued out until the 11th of January, 1869 ; nor had the judgment or decree ever been registered in the manner provided for by the Act of February 14th, 1860. (Paschal's Digest, Article 3962.) *Held,* that the judgment and decree were not dormant in January, 1869.

2. The Act of February 5th, 1841 (Paschal's Digest, Article 4608), provided for revival of judgments on which execution had not issued within twelve months after their rendition ; but this court has already held (in Scogin *v.* Perry, 32 Texas, 21) that the Act of November 9th, 1866, by providing that no judgment should become dormant unless ten years elapsed between executions, repealed so much of the Act of February 5th, 1841, as was inconsistent with it, and dispensed with the necessity of issuing any execution. And now it is *held,* that in like manner the first section of the Act of February 14th, 1860, prevented judgments from becoming dormant in less than ten years after rendition, although no execution had ever been issued.

3. On the 7th of December, 1861, the first of the series of stay laws was enacted, and subsequently the inhibition of executions on judgments was continued by Ordinance of the Convention of 1866, and by Executive proclamations, until this court, in February, 1868, declared the stay laws unconstitutional. *Held,* that while these unconstitutional enactments were practically in force, laches cannot be imputed to a judgment creditor by reason of the mere non-issuance of execution. (Cravans *v.* Wilson, 35 Texas, 52, cited by the court.)

4. A judgment *in personam* and decree of foreclosure rendered in 1861, were constructive notice to parties who, in 1864 and 1866, purchased from or under the defendant, the land subjected to the decree. The rulings in Hargrove *v.* De Lisle, 32 Texas, 170, on the subject of constructive notice, are quoted with approval.

5. The taking of collateral security for purchase-money of land, does not waive or impair an express lien on the land reserved in the sale.

6. The second section of the Act of February 14th, 1860 (Paschal's Digest, Article 3963), providing for registration of judgments, etc., had application to judgments *in personam,* but had no application to decrees for the enforcement of vendor's liens already existing.

7. When judgment *in personam* and decree for sale of land are recovered in the same suit on a purchase-money debt, the judgment *in personam* ascertains the amount due the plaintiff, and the decree subjects the property for the payment of the amount so ascertained.

APPEAL from Denton. Tried below before the Hon. C. C. Binkley.

The case is clearly stated in the opinion.

*Joseph Bledsoe* and *Otis G. Welch* for the appellant. If the appellant Williams, or his vendor Baines, is to be taxed with any notice at all, it must be by virtue of the judgment of Lawler *v.* Lovejoy and others, rendered on the 7th day of March, 1861. Two questions are then to be considered: First. Was this judgment dormant when the order of sale was issued on 11th day of January, 1869? Second. Whether dormant or not, was the lien created or preserved by said judgment *proprio vigore,* without having a copy of the same recorded in the "Book containing mortgages" in the office of the county clerk of Denton county? It would also be proper to notice, even if both of the above propositions should be decided adversely to the appellant, the gross laches of the plaintiff Lawler in not enforcing his judgment in a reasonable time against Lovejoy and others.

By the Act of February, 1840, which went into effect 16th March, 1840 (Paschal's Digest, Article 3954), all judgments of a court of record in this State operated as liens upon the real estate of the defendant in such judgment, situated in the county where the same was rendered; but such lien ceased to exist unless execution was issued out within twelve months from the date of such judgment. And even though execution had been issued, unless the plaintiff used due diligence to collect the same, his lien would be lost. Nor did it make any difference in the character of the judgment, whether it was foreclosing the ven-

dor's lien, or one rendered against the defendant for debt gener-
ally.    The lien would be lost unless the terms prescribed by law
were resorted to by the plaintiff.    This law continued in force
till the passage of the Act of February 14th, 1860.  (Paschal's
Digest, Article 3962.)    This law did not deprive a party of any
lien, or weaken the force or effect of judgments rendered after
its passage, but simply prescribed a different mode by which
they could be secured.    And in order to secure and continue a
lien, it was as obligatory upon the plaintiff in the judgment to
do what was required of him by the law of the 14th of February,
1860, as it was to comply with that of 5th February, 1840.
There were conditions imposed by both, and unless those con-
ditions were complied with, the party failing so to do lost the
benefits which would have accrued to him from a compliance.
By the law of 1840 the plaintiff would lose his lien on the estate
of the judgment debtor unless he sued out his execution within
twelve months from its rendition; nor did it matter whether
the judgment was one foreclosing a vendor's lien or foreclosing
a mortgage, or one for debt simply.    The law made no distinc-
tion in the terms prescribed, or in the diligence required.    Nor
does the law of 14th February, 1860, make any distinction.
(Paschal's Digest, Article 3963.)    The act is plain, imperative,
and comprehensive.    It would be difficult to find language more
expressive and more incapable of being misunderstood than that
used in the last-mentioned section of the statute: "No judg-
"ment hereafter rendered shall operate as a lien until filed in
"the office of the county clerk of the County Court of the
"county where the same is rendered for registration," etc.    The
statute makes no exception in favor of any kind of judgment.
It may be contended that a judgment foreclosing a vendor's lien
forms an exception from judgments generally, and that it was
not necessary to have this class recorded; yet the statute makes
no such distinction.    If such a view could be maintained for a
moment as a correct proposition, it could be said with equal pro-
priety that under the law of 5th February, 1840, it was not
necessary to issue an execution on this character of judgments

within twelve months; that their liens would continue without it. And as recording in the office of the county clerk, in order to secure the lien by the law of the 14th February, 1860, was substituted in the place of the issuance of the execution within twelve months, required by law of 5th February, 1840, if the lien could be preserved without complying with the terms of the law of 1860, the same process of reasoning would relieve a party from complying with the terms of the law of 1840—a position which is deemed entirely untenable.

By the law of February 14th, 1860, no judgment could become dormant unless ten years had elapsed between the issuance of executions. Not that it could not become dormant in less time, between the rendition of the judgment and the issuance of the first execution, but one execution must be issued, and after this the plaintiff might not have another issued for ten years. What does this statute mean? Does it mean that the first execution must be issued within a reasonable time, or was the law of February 5th, 1840, in force as to preventing the dormancy of judgments from transpiring by the issuance of execution within twelve months? The law makes no provision for the party to wait ten years before his first execution, but uses the language, "between the issuance of executions;" not between the rendition of judgment and the issuance of the first execution. It is believed that the object of the law was to remove the necessity of issuing yearly executions after one had been issued, which were oftentimes useless, besides creating unnecessary costs. As no special provision is made for the time in which the first execution should issue, unless that part of the law of 1840 was not repealed by that of 1860, it must follow that the plaintiff was required to use reasonable diligence in suing out his first execution. And from analogy we can safely presume that, as at common law, the party must sue out his execution in a year and a day, and by our previous statutes (if the court should regard them as repealed as to this matter) within twelve months, after the rendition of judgment, that one year would be a reasonable time in which to give the party to sue

out his first execution. Nine years would certainly be an unreasonable time. The plaintiff, Lawler, in the judgment by virtue of which appellees claim title, could have issued his execution at any time from the rendition of judgment until the 7th of December, 1861, a period of nine months, at which time the first stay law was passed by the Legislature. (Paschal's Digest, Article 5125.)

It will also be seen from the General Laws of the Legislature of 1866, p. 127, that the following language is used: " And "provided further, that the provisions of this section shall not "apply to judgments rendered, foreclosing mortgages or liens "upon real or personal estate." Then, if this judgment in favor of Lawler against Lovejoy and others was not dormant, there was nothing to prevent the plaintiff from suing out his execution at that time, without considering the question of the constitutionality of the law. This act was passed November 10th, 1866, and the execution of plaintiff issued on 11th of January, 1869. Taking into consideration the nine months before the stay law of 7th December, 1861, and adding to it the time that elapsed since the war in which an execution might have been sued out, the plaintiff has certainly been guilty of such gross laches as to preclude him from enforcing any lien upon the lot in controversy, even if it should be admitted that he had any.

That there could be any notice created or preserved by the judgment of Lawler against Lovejoy and others, unless said judgment was also not dormant and besides operated as a lien upon the lot in controversy until the day of sale by the sheriff, is not deemed worthy of notice. If there was no lien, then that there was no notice is too manifest for argument. Then the only *notice* that could affect the rights of the appellant to the lot in controversy, would be *actual notice ;* and if he had had this, the defendants in the court below should have shown it, as the *onus* was upon them to do so. They, however, rely solely upon the judgment of Lawler against Lovejoy and others, as constituting notice, and from the statement of facts it will

be seen that they do not pretend to tax the appellant with any actual notice that the purchase-money had not been paid on the lot in controversy. And as the judgment against Lovejoy and others was rendered by default, even Lovejoy himself may not have known that the lien had been foreclosed, but could very reasonably have supposed that the plaintiff Lawler by taking personal security had waived his right to do so ; which, under the decision of Parker County v. Sewell, 24 Texas, he had unquestionably done. And if he had not abandoned it at the rendition of the judgment, he certainly did after the payment that was made to him on the day of its rendition, as is fully evidenced by his failing to record it as required by law, or to attempt in any manner to enforce it for the balance remaining unpaid, for the space of about nine years.

We have not deemed it necessary to discuss the exceptions or assignment of errors separately, but to embody them in the foregoing remarks. The positions assumed are that the judgment of the 7th March, 1861, in favor of Lawler against Lovejoy, was dormant when the order of sale was issued by virtue of which the appellees claim title. That the plaintiff in the judgment failed to preserve his lien on the lot in controversy, if he had any, by neglecting to have his judgment recorded as the law required. Hart v. Russel, 32 Texas, and Scogin v. Perry, same volume, and other authorities fully sustain this position. That there could be no such thing as *constructive notice* of lien which did not exist. That appellant was an innocent purchaser for a valuable consideration. That appellees bought with full notice of the deeds from Lovejoy to Baines and from Baines to Williams, as both of the deeds were duly recorded as the law required on the day of their respective dates. That if there was any notice which could affect the rights of appellant to the lot sued for, it was actual, and that it was incumbent upon the defendants in the court below to have shown this by competent testimony. And lastly, the gross negligence of Lawler in enforcing his judgment, suffering the lot to be sold to two different purchasers without notice,

either actual or constructive, that he set up any claim to having it subjected to paying the balance on his judgment.

With full knowledge of the sale by Lovejoy to Baines, he still permitted his judgment to remain without any attempt to enforce it, thus putting it in the power of Lovejoy to dispose of the property, nor does he make any attempt to enforce his pretended lien till still another innocent purchaser's rights had been put in jeopardy by his negligence.    (Neale *v.* Sears, 31 Texas, 105.)

*Throckmorton & Brown,* and *W. M. Walton,* for the appellee.

WALKER, J.    The appellant brought this suit in the District Court to recover the possession of Lot No. 2, in Block No. 1, in the town of Denton.

John L. Lovejoy purchased said lot, on the 23d day of March, 1859, from P. P. Scruggs, giving his note for the sum of eight hundred dollars, payable on the 1st day of January, 1860, and signed as security by James M. Smoot.    There was an express contract between the parties reserving the vendor's lien, and this contract was witnessed by the note, which note was recorded in the office of the county clerk of Denton county, in the miscellaneous · records, on the 28th day of March, 1859. Scruggs indorsed the note to Lawler, who brought suit on it in the District Court, and at the March term, 1861, recovered a judgment for principal and interest, and also obtained a decree for the foreclosure of the vendor's lien.    Lovejoy paid about seven hundred dollars on the judgment, the day it was rendered. There was no execution or order of sale, until the 11th day of January, 1869, and the property was sold under the order of court, on the 15th of March, 1869, when Murphy and Daugherty became the purchasers.

But, on the 15th day of June, 1864, Lovejoy sold the property to Wm. C. Baines, and on the 27th of March, 1866, Baines sold to Williams, the appellant.

The cause was tried in the District Court, resulting in a judg-

ment for Daugherty, sustaining the sheriff's deed. Numerous errors are assigned in the record, from which we deduce the following three propositions:

*First.* Was the judgment and decree of the court dormant on the 11th day of January, 1869?

*Second.* Did Lawler's judgment against Lovejoy, and the decree of the court to enforce the lien, continue and subsist against the property, until the same was sold under the order of court?

*Third.* Were Baines and Williams innocent purchasers for a valuable consideration, without notice?

These propositions are all answered by the prior decisions of this court. In Scogin *v.* Perry, 32 Texas, 31, the court hold that the act of November 9th, 1866, repeals Article 4608, so far as the two acts are inconsistent with each other, and that the judgment of a court of record, by force of the act of 1866, will be kept alive, although no execution be issued upon it.

The act of February 14th, 1860, was in force when the judgment and decree were rendered in the case of Lawler against Lovejoy; and this act also provided that no judgment should become dormant until more than ten years had elapsed, after the issuance of execution. This provision of the two acts is substantially the same in each, and the authority of Scogin *v.* Perry applies to both.

On the 7th day of December, 1861, the Legislature enacted the first of the series of stay laws. Subsequent enactments, the Ordinance of the Convention of 1866, and executive proclamations continued the inhibition until February, 1868, when the Supreme Court declared the stay laws unconstitutional.

In the case of Cravans *v.* Wilson, decided at the present term (35 Texas, 52), we have approved the doctrine of Scogin *v.* Perry, and declared that the time during which the stay laws were in force shall not be computed, to fix laches upon a party not otherwise guilty. But nine months had elapsed between the rendition of the Lovejoy judgment and the pas-

sage of the first stay law. The law of 1866 introduced a new rule to that of 1860, and would govern in matters of limitation from the time it went into force.

There is no rule of construction which this court has ever heretofore adopted, which would declare the Lawler judgment dormant at the date of the sale from Lovejoy to Baines, in 1864, nor at the time the appellant purchased from Baines, in 1866, Lawler having had but nine months in which he could have issued execution. The judgment and decree, being in full force and virtue, and open on the records of the court, must affect Lovejoy's vendee, and those claiming under him, with notice. They stand much in the position of purchasers *pendente lite*.

In the case of Hargrove *v.* De Lisle, 32 Texas, 170, the court held as follows : " A levy in February, 1861, of an execution " emanating from a judgment of a United States court, created " a lien which subsisted, it seems, without sale or further process, " until the issuance of another execution in May, 1867 ; and a " person who, in 1864, purchased the land levied on, was chargea-"ble at the time of his purchase with constructive notice of the "levy and its lien, and could only acquire title subject thereto. " A person who bought land in 1864, with constructive notice of " such a lien, assumed, with respect to the land, the exact posi- " tion of his vendor, the judgment debtor, and cannot claim that "the land has become exonerated of the incumbrance, by the "failure of the judgment creditor to have the judgment re-in- " scribed before its lien expired. Had he bought the land after "the lien had lapsed for want of a new registration of the judg- "ment, he might have occupied a different attitude."

The equitable lien of the vendor follows the land in the hands of the vendee, by implication of law, unless it appear that the vendor intended to abandon it, by taking other security for the payment of the purchase-money.

In this case Lovejoy gave Scruggs personal security for the eight hundred dollar note, and, if this fact stood alone, we should hold that there was an abandonment of the vendor's lien, if there had been no expressed contract reserving the lien ;

but this lien did subsist, and remained in force at the time of the decree of March 7th, 1861, and this decree did not extinguish the lien. The decree was for its enforcement.

But it is claimed, that by the second section of the act of February 14th, 1860, the judgment did not become a lien on the land unless it was recorded in the office of the county clerk. This is doubtless true of judgments *in personam ;* but a compliance with this law was intended to give a lien, and could not be required where an equitable lien already existed, and had been ascertained by the decree of the court. The rendition of a judgment upon a note secured by a vendor's lien, does not merge the equitable rights of the plaintiff in the judgment *in personam ;* they remain to be enforced by the decree *in rem.*

Under the judgment *in personam,* the amount due the plaintiff is ascertained, and the decree *in rem* subjects the property encumbered by the lien to the payment of that amount. In the case of Briscoe *v.* Bronaugh, 1 Texas, 326, the doctrine of notice as applicable to this case, in the effect which it has on the rights of the parties, is very ably discussed. Under the question, is the plaintiff's title affected with notice of a prior equity? the court say :

" The effect of bringing home to the plaintiff notice of the " defendant's lien would be, that the former can derive no " benefit from his legal title as against the latter. A purchaser " with notice of a lien, takes the estate, if at all, subject to the " prior equity, and cannot set up his title against the person " holding it, until he has first paid off and discharged the in- " cumbrance. The notice is said to raise a trust in him to " the amount of the lien. And if (as in the present case) the " purchaser resists, and seeks to overcome the claims of the " party having the prior equity, and it be made to appear " that he purchased with notice, he will be held a trustee for the " benefit of the party whose rights he has thus sought to de- " fraud and defeat. 2 Sug. Vend., 279. The ground of the " doctrine is stated by Lord Hardwicke to be, that ' The taking " ' of a legal estate, after notice of a prior right, makes a per-

" ' son a *mala fide* purchaser; and not that he is not a pur-
" ' chaser for a valuable consideration in every other respect.
" ' This is a species of fraud or *dolus malus* itself.'   3 Atk.,
" 646."

The main point decided in this case is this: The vendee
holds in trust for the vendor until the purchase-money is paid,
and this trust attaches to the land in the hands of subsequent
purchasers with notice.

We think the appellant is charged with notice in this case;
and we do not think it important to give any further reason
for affirming the judgment of the District Court; which is
done.

Affirmed.