P. T. BLACK v. B. H. EPPERSON ET AL.

1. A judgment in the Supreme Court, rendered April 28, 1859, affirming the judgment below, with damages against the plaintiff in error, in a case in which the writ of error and error bond bear date 4th of same month, is not void.

2. Prior to the repeal, January 28, 1860, of the 6th Section of the act concerning proceedings in the Supreme Court" (Paschal's Digest, Articles 1583–1592), and under the repealed section, it was the duty of the plaintiff in error to file the record within forty days after the perfection of his process in error, and the practice in this case was in accordance with the law in force at the date of said judgment in the Supreme Court.

3. Everything must be presumed in favor of regularity in all things necessary to the jurisdiction of a court having exclusive jurisdiction of the subject.

4. Upon an affirmance, on appeal or error, of a judgment, and against the sureties on the error or appeal bond, such surety, being liable, may at

any time pay the judgment, and thereby become subrogated to all the rights of the creditor at the time of such payment.

5. The official notice of the action of the Supreme Court to the district clerk after the writ of error has been perfected, is *the mandate*, and until the mandate is filed the clerk cannot issue execution; therefore, the issuance and filing of the mandate will be presumed, from the issuance of executions upon a judgment in the District Court, after the same has been affirmed on error.

6. There is no prohibition on the issue of a second mandate, and the issuance of one is not inconsistent with the fact of a former one.

7. By the act of February 14, 1860, and the act of November 9, 1866, the vitality of all judgments in the District Court was extended for a term of ten years between executions.

8. The judgment of the Supreme Court, April 28, 1859, against the plaintiff in error and sureties on the error bond, fixed a lien upon the lands in the county belonging to the plaintiff in error and his sureties; the issuance of executions in June, 1859, on February 2, 1860, on September 6, 1860, returned February 4, 1861, preserved the lien until the war; the war and the stay law of December 7, 1861, renewed and extended in December, 1863, enforced by military orders in 1865, protracted by the Convention of 1866, modified and renewed by the Legislature of 1866, and continued in practical effect until February 24, 1868 (when the stay law was declared unconstitutional), excused acts of diligence, and during that term such judgment lien was preserved.

9. Scogin v. Perry, 32 Texas, 21, limited.

10. See history of the stay measures and their effect from 1861 to 1868.

11. An indigent debtor can sell his homestead and acquire another without subjecting the abandoned homestead to his general debts, the vendee taking as against a judgment creditor who otherwise would have a lien.

APPEAL from Titus. Tried below before the Hon. J. D. McAdoo.

*Walton & Green*, for appellees, on motion to dismiss.— In asking the court to dismiss this appeal on the grounds of insufficiency of the assignment of error, we act from no desire to present frivolous or captious points of delay or objection, but ground our motion upon what has often been announced by this court as the law governing the case.

We submit that the assignment of error in this cause is too vague and general, and does not fill the measure pre-

scribed in Article 1591, Paschal's Digest, and so recently demanded by this court. (See Rule 22.)

The warning voice of this court has gone out, time after time, remonstrating against that loose and irregular practice which calls upon the court to search out for itself from the folds of voluminous records the portion challenged as erroneous; and although this court may not hitherto have refused to perform the labor thus unduly thrown upon it, it has ever maintained its right to decline to review a record where the party asking reversal did not, to use the language of this court, in Seawell v. Lowery, 16 Texas, 51, "put his finger on the error."

In the case of Hicks v. Bailey, 16 Texas, 229, the court in terms refuse to inspect "the various instruments of evidence" contained in the record, in order to see whether or not a general assignment of error was cause for reversal; and we further call the attention of the court to the objection made in the same case to such generality, on grounds that assignment "gives the defendant in error no notice of the particular error intended to be relied on for reversal."

The assignment in this case remands your honors to the record for the "facts" upon which it complains erroneous judgment was rendered, and to a motion for a new trial, which is equally vague and uncertain, directing the court in no way to a particular error.

We urge the court to do themselves and us the justice of demanding that the plain requirements of the rule as laid down in cases cited be complied with, and that the indulgent warnings, as given in 12 Texas, 329, Thompson v. Thompson; 28 Texas, 143, Colquehoun v. Howard; 34 Texas, 15, Davis v. Davis; 34 Texas, 253, Wright v. Hays, be heeded, and Rule No. 22 be enforced.

*Culberson & Sparks*, for appellant.—The only questions which we shall consider in support of the assignment of errors are—

1. Was the judgment against Harris a lien upon the land described in the petition at the date of its rendition?

2. Has the judgment lost its lien, either by the laches of the creditor, or by the subsequent sale of the land by the debtor?

3. Does the lien subsist and inure to the benefit of the surety on the writ of error bond, who has paid off the judgment?

I. In affirmance of the first proposition, we cite Paschal's Digest, Article 3783, which we think was the only statute in force upon the subject at the time the judgment was rendered. (See also Robertson v. Moorer, 25 Texas, 428, and Berry v. Shuler, 25 Texas Sup., 140.) The statute of February 14, 1860, was enacted subsequent to the rendition of the judgment; and so far as that act required registration of judgments, it did not apply to this. Its language is, "No judgment hereafter rendered," etc. (See Paschal's Digest, Article 3963.)

II. Nor do we think that the lien of judgment has been lost. From the date of the fourth execution until the act of Secession, was five months and twenty-three days. After the State government and the courts and records had passed into the possession of an authority in hostility to the United States, was the judgment creditor at once compelled to recognize that authority, even though she were a citizen of the State? In several cases the Supreme Court of the United States have decided that the rebellion suspended all statutes of limitation as against citizens outside of the rebellious districts; and they say, that "neither *laches* nor fraud can be imputed to the creditor in such a case, as the inability to sue becomes absolute by the declaration of war." (See Levy v. Stewart, 11 Wallace, 254; 6 Wallace, 534; 12 Wallace, 700.) The sovereign authority of this State also recognize the force of this rule and apply it between citizens of this State, and in doing so relate its operations back anterior

to the act of Secession, and to a period to within four months and twenty-two days of our fourth execution. (See Section 43, Article 12, of the State Constitution.) ; And this court has decided, that "this provision is neither *ex post facto* nor a law impairing the obligation of a contract." (See Crawford v. Bender, 33 Texas, 745.)

If we are mistaken as to the effect and operation of this provision, still we show that the first stay law was enacted December 7, 1861, and less than one year after the return of the last execution. When this execution was issued does not appear from the records of the District Court of Titus county, except inferentially from the entries on the execution docket, which was the only evidence upon the subject, and wherein the last entry of the issuance of execution is March 4, 1860, but there is an entry of the return of an execution on February 4, 1861. We respectfully submit, that it is more reasonable to presume that this last execution was issued at the next preceding term of the court, rather than that the clerk would issue an execution returnable more than a year after its date. Be this as it may, however, it seems to have been the turning point in the case with the court below, and the court by its judgment seems to have decided that it was necessary to have an execution every six months to keep alive the lien of the judgment. To us this appears to be a severe construction of the statute by virtue of which we claim this judgment lien. The judgment of the court was doubtless influenced by the decisions of this court upon the construction of the language of an essentially different and older statute. (See Article 3954, Paschal's Digest; and also see 13 Texas, 515; 13 Texas, 379; 1 Texas, 508; 7 Texas, 269.) It will be perceived, upon comparing Article 3783, Paschal's Digest, with Article 3954, same digest, that the latter is much more onerous on the creditor than the former. The last section is from the act of February 5, 1840, whereas the.

former section is from the act of January 27, 1842, and
which statute was the only law in force upon the subject
at the rendition of this judgment.   The statute of 1840
required, to preserve the lien of the judgment, that exe-
cution should issue thereon within twelve months, and
"that due diligence should be used to collect the same."
The subsequent and amended statute, entitled "An act to
reduce into one and amend the several acts concerning
executions," only required that execution should issue
within twelve months after judgment (see General Laws,
Sixth Congress, p. 66), and was clearly substituted for
the former statute.

It will be seen by reference to the cases last cited that
they all proceed upon the wording of the old statute, or
at least we can find no case where this distinction has
been observed or noted, either in brief or by the court.

III.   If the lien subsists at all, we suppose it will not
be controverted that the appellant is subrogated to all of
its benefits, to the extent of his payment on the judg-
ment.   (See Paschal's Digest, Article 4787.)

*Walton & Green*, for appellees.— I.   The record shows
conclusively that the bond for writ of error and *superse-
deas* was filed the fourth of April, 1859, and the writ of er-
ror issued the same day.   As to when the citation in error
was served on Mary A. Reagan is not shown, but the writ
of *supersedeas* was served April 5, 1859.   The record also
shows conclusively that the judgment of affirmance was
upon a suggestion of delay by the defendant in error,
Reagan, and was dated April 28, 1859, only twenty-four
days after the filing of the writ of error bond and the is-
suance of the citation in error.

Now, we submit that this unadvised action of the Su-
preme Court upon the application of the defendant in
error was wholly without authority of law, and was void,
and the judgment rendered thereon a nullity.

The statute of 1850, Paschal's Digest, Article 1587, in force then and now, which provides that the transcript shall be filed at the first term of the Supreme Court at which the cause is returnable, in its last clause further enacts: "*Provided*, that such appeal was perfected, or such citation was served, forty days before the first day of the term next succeeding the taking thereof, or forty days before the first day of the time in said term designated by the court for the trial of causes brought from the district," etc.

And the Supreme Court, in the case of Kernaghan v. Hall, 31 Texas, 128, in relation to this statute, say : "The statutes require forty days to elapse as the least time in which the party is required or permitted to file the record." See also Stephens v. Thayer, 25 Texas, 341, in which Judge Bell says: "If the appeal has been perfected, or the citation in error served, forty days before the first day designated by the Supreme Court for the trial of causes from the district to which the case belongs, then the transcript must be filed here; but the case is not properly returnable to this court unless forty days have elapsed between the time when the appeal was taken, or the citation served, and the first day of the time designated by this court for the trial of causes from the district to which the case belongs."

This was the rule then, and had been from the decision of the case of Wheeler v. The State, 8 Texas, 228, construing the act of 1850, above referred to.

That judgments rendered inadvertently by the Supreme Court are of no binding force, unless they have the case properly before them, but are absolute nullities, and will be revoked at a subsequent term, is the doctrine of this court, and has been since the case of Martin & Ward v. Latimer & Bagby, 4 Texas, 335. (See also on same subject Mills v. Bagby, 4 Texas, 320, and Harris v. Williams, 4 Texas, 339.) In the latter case, as well as many

others subsequent thereto, it is held, that where the defendant in error seeks to enforce such a rigid rule, as that the judgment shall be affirmed without reference to merits, or, as in this case, damages for delay, he shall himself be held to the observance of the strict letter of the law.

The result arrived at is, that in the case of Harris v. Reagan, which is the basis of the plaintiff's rights, the affirmance of the judgment was an inadvertent act by the court, that it had no jurisdiction of the case at the time of the judgment, and that its decision or affirmance was a nullity which no lapse of time could cure. Hence the plaintiff was not compelled to pay the debt, but might have defended himself successfully against it, and his payment was therefore not compulsory, but voluntary, and in an action even against the principal he could not have recovered.

But this case presents another view, which is the proper one in this case. This suit is brought upon the principle, that upon the payment of the debt by the surety, he is entitled to have assigned to him all the securities which the principal debtor had given the creditor, or those which by operation of law had been exacted from the principal debtor. Now, as there was never any legal judgment in the Supreme Court which it was the duty of the principal debtor to pay, or, in other words, as the pretended judgment in the Supreme Court against Harrris was a nullity, the creditor himself could not have enforced it, and there was nothing left to be assigned to the surety of Harris, on payment; but his remedy, if any, was to recover of the party to whom he paid the amount of the claim, the money so paid.

II. But the principal question below was, that the plaintiff, and those under whom he claims, had by his laches or want of diligence lost whatever lien the judgment creditor ever possessed.

The act of 1840 provides, that whenever final judgment shall be rendered, etc., it shall operate as a lien on all the property of the defendant situated and being in the same county where judgment is rendered, from the day of the date of the judgment; provided, that said lien shall cease to operate if execution be not issued out in twelve months from the date thereof, and due diligence be not used to collect the same. (Paschal's Digest, Art. 3954.)

· The act of 1842 was to the same effect as to real property, omitting the words in the proviso in regard to due diligence in collecting the judgment.

In the case of Bennett v. Gamble, arising under the act of 1840, it is decided that the statutory lien was given by the issuance of execution within the year, but it could only be preserved by the use of due diligence, which was construed to mean the issuance of execution from term to term.

In Shepard v. Baillieul, 3 Texas, 30, arising also under the act of 1840, the same doctrine was affirmed as to the necessity of diligence, and the court further remark: "There is a great error in supposing that the delay is only a question between the plaintiffs and the defendants in execution; other rights have intervened, and it is for the protection of such rights that the Legislature imposed on the plaintiff in a judgment the use of diligence if he wishes to continue the lien."

The cases of Scott and Rose v. Allen, 1 Texas, 514; Hall v. McCormick, 7 Texas, 269; Fessenden v. Barrett, 9 Texas, 475; and Graves v. Hall, 13 Texas, 379, all follow and recognize the doctrine laid down in Bennett v. Gamble. But in the case of De Witt v. Jones, 17 Texas, 623, which arose after the passage of the act of 1842, Chief Justice Hemphill applies the doctrine of diligence announced in the case of Bennett v. Gamble as in full force, and among other things uses the very strong expression, " The judgment becomes as dormant by the

failure to issue executions in the subsequent as it does in the first year after its rendition;" and Justice Smith, in Russell v. McCampbell, 29 Texas, speaking of the two acts, that of 1840 and 1842, above quoted, says that although there is no positive provision in the act of 1842 providing as the act of 1840 did, the court is inclined to the opinion that due diligence must be used to collect the execution in order to preserve the lien, and further remarks that such was the common law.

In the last case it is further held, that where a party purchases from the judgment debtor after judgment, the failure of the creditor to issue execution within twelve months will destroy the lien as against such purchaser, notwithstanding, by an agreement between the plaintiff and defendant in execution, a stay of execution for six months had been granted and entered of record.

From these authorities we arrive at the conclusion that the lien of the judgment creditor upon the lands of Harris had been lost on either ground which may be taken by the plaintiff, whether considered with reference to the regularity of the issuance of execution or the failure to bring down the mandate.

If the judgment of the Supreme Court be regarded as obligatory on Harris and his sureties, then we have the following facts: That execution issued June 14, 1859, February 2, 1860, and September 10, 1860, this being the last execution ; after which time there was one year and three months, till the act of December 7, 1861, in which there was no law which prevented the plaintiff from making his money out of Harris by execution ; and counting out the years of the war, we have from the time the courts were opened, in the autumn of 1865, to the bringing of this suit, September 25, 1869, four additional years in which the plaintiff might have sued out his execution.

The attempt of plaintiff's counsel to bring in the late

unhappy war to cover his negligence, or that of the party under whom he claims, has in it neither merit, law, or justice. Such a doctrine may be made very properly to apply in a case where one of the parties was without the limits of Texas, and an inhabitant of the territory of the opposite belligerent; but it cannot be applied to those who inhabited the same jurisdiction. No law, rule, or decision can be found which invalidates the local acts and proceedings of one of the revolted States as between citizens of the same territory, and especially where the rights of third persons are concerned.

The question here is one of negligence, or want of diligence on the part of the creditor, by means of which he has permitted innocent persons to become the purchasers of property upon which he claims a lien, when, if he had used the slightest diligence to enforce his demand, he would have been paid his money, and these parties would have been saved this expensive suit.

And we conclude, that if diligence was required to preserve a lien under the law, the negligence of the creditor had lost it.

But in another view of this case the utter want of diligence of the plaintiff in execution becomes most manifest, viz.: It is in proof, that though the judgment in Harris v. Reagan, in the Supreme Court, was affirmed on the twenty-eighth of April, 1859, yet the mandate was not issued until the twenty-fifth of February, 1868, nearly nine years after. This is the grossest negligence, for until the mandate was issued there was no power on the part of the District Court from which the appeal was taken to issue an execution, or take any steps in the cause towards the enforcement of the judgment. The last clause of Article 1571, Paschal's Digest, with reference to cases in the Supreme Court on error or appeal, enacts, that "the clerks of the various District Courts, on the receipt of the mandate of the Supreme Court in any

such case, shall proceed to issue execution thereon, as in other causes."

We therefore insist, that until the mandate came down to the District Court, there was no authority in the court to issue execution; and the executions of June 14, 1859, February 2, 1860, and September 10, 1860, were utterly without authority and void—not simply irregular, but void—because of the violation of a plain provision of the statute and the assumption of power prohibited to be exercised.

If this be true, and we believe it is, there was never at any time any act of diligence except the issuance of the first execution, December 1, 1858; and the acts paraded as acts of diligence, so far from being meritorious, were acts of lawlessness, which can give no credit to the plaintiff or the persons under whom he claims.

We conclude, therefore, that there is—

1. No legal judgment, the case never having been affirmed in the Supreme Court in such way as to make the judgment of binding force.

2. That if it was properly affirmed, the plaintiff in execution has lost the lien on the lands owned by Harris by his negligence or want of diligence; first, by failure to take out the mandate for nine years; and second, by failure to issue the executions from term to term, or at least from year to year.

3. That a great difference in the cases is observed between the dormancy of a judgment and the preservation of liens under the judgment; one may exist while the other is destroyed, and as to the latter, any unreasonable negligence or want of diligence will destroy it.

4. That as far as purchasers from the judgment debtor are concerned, the court will strictly construe the law that the interest of trade and of the community may not suffer, and will hold the creditor to that degree of diligence which will put persons of ordinary prudence on their guard with respect to his claims.

Believing that all these points are with the plaintiff, we ask the court to affirm the judgment.

*Culberson & Sparks*, for appellant, in reply.—1. In support of the main question presesented by the record, and in addition to authorities already cited, we also cite Moore v. Litchford, 35 Texas, 185.

2. In reply to appellees' brief, we refer to the case of Lawler v. White, 27 Texas, 250; see also American Leading Cases, Vol. 2, 736–737. These authorities appear fully sufficient to establish the principle, that what is done by a judicial tribunal possessing general powers, and within the scope of those powers, must be deemed to have within itself the force necessary to support itself, and cannot be called in question except in the regular mode of examination for such errors; and if this doctrine is true in its application to proceedings in the District Court, is it not much more applicable to the judgments of this court? But, if it were otherwise, when a judgment debtor prosecutes his appeal to this court, the judgment is affirmed, and executions issue thereon for several succeeding terms of the court below, a strong presumption arises that the whole proceedings were regular, and within the knowledge and by the consent of the debtor; and this presumption, already reasonable, becomes conclusive where the debtor so far recognizes the legality of the proceedings as to make payments upon the executions.

We submit, therefore, that the mandate which was returned several years after those executions and payments is no evidence of want of diligence upon the part of the judgment creditor; but, on the contrary, it is reasonable to presume that it was the second mandate, which issued after the collection laws had been suspended, and when the creditor had reason to hope that he might again pursue his debtor; it was a renewal of his diligence in pursuit of his remedy.

GRAY, ASSOCIATE JUSTICE.—This is a suit by appellant to enforce an alleged lien of a judgment upon land, which was purchased by appellees some years after the judgment.

The cause was submitted to the court below upon demurrers to the petition and upon the pleadings and evidence.

The facts alleged in the pleadings and shown in evidence are, substantially, that on the second day of November, 1858, Mrs. Mary A. Reagan recovered a judgment, in the District Court of Titus county, against one James G. Harris, who then owned, and continued until 1864 to own, the lands now claimed by appellees in that county. On one of the tracts, now owned by appellee Lacy, was the homestead of Harris, where he then resided with his family. Execution issued on the judgment on the first of December, 1858, which was levied on other lands pointed out by Harris, but to which it appears he had no title. This execution, however, was superseded on the fourth of April, 1859, by a writ of error sued out by Harris, and bond executed on that day by him, with three sureties, one of whom was appellant.

By which party or on what day the transcript of record in error was filed in the Supreme Court, does not appear; but it does appear that on the twenty-eighth of April, 1859, the judgment was affirmed, with ten per cent. damages for delay, against Harris and his sureties on the bond.

This fact was alleged, and was shown by a mandate issued by the clerk of the Supreme Court on the twenty-fifth day of February, 1868, and filed in the District Court on the twenty-seventh of that month; and is also alleged and shown in evidence, by entries on the execution docket, that after the judgment of affirmance, *alias* executions were issued, viz., on the fourteenth of June, 1859, second of February, 1860, and sixth of September,

1860, the last having been returned on the fourth of February, 1861. These entries also showed returns of the sheriff, by which it appeared that on the first of these executions the debtor, Harris, had made a partial payment of $250, and the execution held up by order of plaintiff's attorney. The second was likewise returned by order of plaintiff's attorney, and the last simply returned "not satisfied."

These facts were shown only by reading portions of the entries on the execution docket; for the statement of facts says, "By consent, such portions of the execution docket as referred to the executions issued on said judgment were offered in evidence," etc. Neither the original executions, *supersedeas* bond, nor other paper in the suit of Reagan v. Harris, except the judgment on the minutes, was given in evidence ; nor any reason assigned why they were not produced, such as their loss or destruction.

No further proceedings appear to have been had until February, 1868, when the judgment creditor filed the mandate. In the meantime Harris, the judgment debtor, sold the lands in Titus county to appellees, in 1864, including the tract to Lacy, by deed, in which his wife joined, duly acknowledged, proved and recorded. He removed with his family to Red River county in that year, acquired another homestead there, and died in 1867. Administration was opened on his estate ; a copy of the original judgment, and mandate from the Supreme Court, of February, 1868, were probated and allowed as a just claim against the estate in March, but the estate was insolvent, and had been closed without paying the claim.

Of the other sureties on the *supersedeas* bond, one had died insolvent, and another had become insolvent. Appellant, remaining the only solvent party, without waiting for further issue of execution, paid the debt in June, 1868, to the judgment creditor, and now claims to be subrogated to her rights of lien on the land.

Appellees, in defense, do not deny that the original judgment of November, 1858, and *supersedaes* bond of fourth of April, 1859, took lien on the lands of the judgment debtor; but it is insisted—

1. That the supposed judgment of the Supreme Court in affirmance, and declaring the forfeiture of the *supersedeas* bond, was unadvisedly entered before the lapse of forty days from the perfection of the writ of error process, and when it was not returnable to that term; and that therefore the court had not acquired jurisdiction of the cause, so that its entry of judgment was void. As a consequence, it is claimed that the judgment has not been affirmed, that appellant was not liable for its payment, and that by his voluntary payment of the debt he could not be subrogated to the rights of a judgment creditor holding a lien.

2. That if the judgment was properly affirmed, the creditor had lost the lien on the lands owned by the judgment debtor, by his negligence or want of diligence; first, by failure to take out the mandate to the District Court with proper diligence; and second, by neglecting to issue executions from term to term, or at least from year to year.

3. That in any event the appellee Lacy is entitled to protection as to the two hundred acre homestead, part of the Nugent tract, occupied by Harris at the time of original judgment and *supersedeas* bond, and when Lacy purchased it in 1864.

The district judge overruled the demurrers of appellees, but gave judgment in their favor on the evidence dismissing the petition. Motion for new trial was made by appellant, which was overruled, and appeal taken. The decree also adjudicates matters of controversy between some of the appellees, from which there was no appeal, and of which no notice need be taken.

The questions presented are not without difficulty, arising chiefly from the various changes of the statutes, and

some incongruity in the opinions construing them, under which the rights of the parties have arisen.

On the first question, whether the judgment of affirmance by the Supreme Court in April, 1859, was void for want of jurisdiction, because rendered within forty days after the perfection of the error process, appellees mainly rely on the cases of Stephens v. Thayer, 25 Texas, 341, and Kernaghan v. Hall, 31 Texas, 128. These decisions were made in cases arising after the repeal of the 6th Section of the "Act concerning proceedings in the Supreme Court," of the eleventh of February, 1850. (Paschal's Digest, Articles 1583–1592.) This repeal, enacted on the twenty-eighth of January, 1860, materially changed the law and the former practice under it. Since that repeal the practice has been clear and uniform, and is well stated in Stephens v. Thayer. The paragraph cited from the second case, stating that " the statutes require forty days after the perfection of an appeal or writ of error to elapse as the least time in which the party is required *or permitted* to file the record," if considered alone, is not quite intelligible, and might mislead; but taken in connection with the facts of the case decided, it is not inconsistent with the statute and Stephens v. Thayer.

The repealed section required the plaintiff in error, in all cases, to file the record within forty days after the perfection of his process in error. Under that section the practice was not invariably uniform, but the current of authority was in favor of a prompt disposition of all cases filed. The decisions in Wheeler v. The State, 8 Texas, 228, and Wilson v. Trueheart, 13 Texas, 287, support the practice as pursued in this case; and in Chambers v. Shaw, 16 Texas, 146, it was even said that the defendant in error may acknowledge service of the citation, and bring up the record, and submit the case to the court as a delay case, or for revision on the merits. Under the practice as then existing, it appears to us clear that the

court regularly proceeded. Certainly it does not affirmatively appear that there was irregularity. We cannot presume that the record was not filed by the plaintiff in error; nor that he did not appear by counsel. Every presumption must be indulged in favor of regularity in all things necessary to the jurisdiction of a court having exclusive jurisdiction of the subject. Nor do we think that the judgment is liable to attack by other parties and in another tribunal for the supposed irregularity of proceedings. A domestic judgment on a subject within the jurisdiction of the court, and apparently regular on the record. is to be taken as conclusive of the regularity of proceedings by which jurisdiction was acquired over the parties (Lawler. v. White, 27 Texas, 250; Withers v. Patterson, 27 Texas, 491; Mitchell v. Meuley, 32 Texas, 460); unless it be attacked in a direct proceeding for that purpose, as was done in the cases cited by counsel—Martin & Ward v. Latimer & Bagby, 4 Texas, 335, and Mills v. Bagby, 4 Texas, 320.

The judgment of affirmance having been rendered, we are of opinion that appellant, being thereby liable as surety for its payment and to execution against him, might voluntarily pay it at any time. and become subrogated to the rights of the creditor. He was not bound to await the action of the creditor, but might for his own protection pay the debt and control the judgment and execution. If, however, he chose to wait, and any laches of the creditor occurred, by which his lien or other security should be lost, and the surety then pay the debt, he would only be subrogated to such rights and securities as the creditor then had. The laches of the creditor would reasonably be imputed to him also, because he might by earlier payment have himself exercised the necessary diligence to secure and protect himself. He stands in the place of the creditor from the time of his payment, as an assignee would. The whole subject is thoroughly

discussed and authorities collated in Hare & Wallace's Notes to the case of Dering v. Earl of Winchelsea, 1 White & Tudor's Leading Cases in Equity, 143–150.

On the second question, whether the judgment creditor or appellant had lost the lien of the judgment by laches in enforcing it, the chief difficulty arises from the meagre evidence on that subject, which the appellant, as plaintiff, ought to have made fuller and clearer, or have shown why it was not in his power so to do. After the writ of error and *supersedeas* bond, of course no further execution could lawfully issue on the judgment of the District Court; nor after affirmance, had the clerk authority to issue execution, until official evidence of the fact had been filed in his office. The official evidence directed by the statute is a mandate issued by the clerk of the Supreme Court (Paschal's Digest, Article 1571), which mandate he is "not compelled to issue and deliver,   *   * or certify the proceedings to the proper court, until all of the costs accruing on the cause in the Supreme Court shall have been paid." It is left optional with the clerk by the statute (Paschal's Digest, Article 1568); and therefore it was the duty of the creditor to procure and file the mandate in the District Court, within such time as might be necessary to preserve the lien of his judgment by issue of execution. What was done? The only evidence on that point is, that a mandate was issued and filed in February, 1868; that an execution, however, had issued from the District Court in June, 1859, less than two months after the affirmance of judgment; that on this execution the principal debtor made a considerable payment, and two other executions were issued and returned.

It is insisted, that as no other mandate was in evidence, the legal presumption is, that no other had been issued; and it is true that a party is presumed to have given the best evidence he can. Had there been no other evi-

dence, that would be the reasonable conclusion; but how can that conclusion be reconciled with the prior issue of executions and payment by the debtor? The conclusion insisted upon involves the presumption, that the clerk violated his duty and acted without authority; and also, that the debtor acquiesced in this illegal proceeding to his injury—not only by the payment, but by taking no steps to set aside the subsequent executions against him for nearly two years. Such a presumption cannot be reasonably maintained; but, on the contrary, the legal rule is, that presumption arises in favor of the regularity and due performance of duty by an officer, in the absence of negative evidence. Because a mandate was issued in 1868, does not negative that one had been issued. There is no prohibition on the issue of a second mandate, and therefore its issue is not inconsistent with the fact that a former one had issued and was lost, mislaid, or destroyed. We therefore conclude that a mandate was issued and filed before the issue of execution in June, 1859.

The other point on this question of laches relates to the failure to issue executions from February, 1861, until the death of the judgment debtor in 1867, or against his sureties on the *supersedeas* bond until the payment by appellant in June, 1868. It can only relate to this period; because, if, as we have said, the mandate was issued and filed, the executions in June, 1859, and subsequently running to February, 1861, were regularly issued, and in due time to preserve the lien of judgment, given by the execution act of 1842. (Pas. Dig., Art. 3783.) The lien of the original judgment was preserved by the issue of execution within one month, in December, 1858; and that of the *supersedeas* bond (which had the "force and effect of a judgment against all the obligors," according to the statute, Paschal's Digest, Article 1495, and decisions in Robertson v. Moorer, 25 Texas, 428, and Berry v. Shuler, 25 Texas Sup., 140) was pre-

served by the executions issued in 1859 and 1860, running to February, 1861. At that date, then, the judgment was not dormant nor the lien lost. Did any subsequent want of diligence produce that result?

1. As to the dormancy of the judgment. It continued in vigor for one year after the last execution—that is, until February, 1862—according to the opinion of Chief Justice Hemphill, in De Witt v. Jones, 17 Texas, 623, where he said that "the judgment becomes as dormant by failure to issue executions in the subsequent as it does in the first year after its rendition, and the right to revive exists in either case. In the first, it is given by the statute; in the latter, from analogy to the rule prescribed in the statute." He referred to the 2d Section of the act of limitations of February 5, 1841. (Paschal's Digest, Art. 4608.)

This opinion was expressed in 1856, in a case arising under the execution act of 1842, as does the present case. We concur in that opinion, as affording a reasonable rule under the law existing prior to the act of February 14, 1860, "to prevent judgments from becoming dormant, and to create and preserve judgment liens." (Paschal's Digest, Articles 3962–3965.) The first section of that act provides, that "whenever judgment shall be rendered in any court of this State," execution may be issued thereon by the court or clerk, and that "said judgment shall not become dormant unless ten years shall have elapsed *between the issuance of executions* on the same."

These provisions seem to imply, first, the issue of execution on the judgment; and second, that after such issue the lapse of ten years between executions would be necessary to produce dormancy of judgment. It manifests the intention of the Legislature to extend the time of diligence after one or more executions had issued within the year. It is a more liberal and reasonable policy than had previously prevailed. We incline to the opinion that

this first section was intended to operate prospectively in favor of prior judgments then having vitality, as well as to subsequent judgments; while the 2d Section, requiring judgments to be recorded before any lien should attach, by its express language only related to judgments "hereafter rendered."

The last provision of the 1st Section of the act of 1860 is retained by the 3d Section of the act, having the same title, of the ninth of November, 1866 (Paschal's Digest, Art. 7007), though the terms of it are clearer and evidently do apply to both prior judgments not then dormant and to subsequent. If this provision of the act of 1860 operated upon prior judgments then in force, and extended the rights of creditors holding them, continued as it was by the act of 1866, then it would plainly appear that the judgment here in question would not become dormant until ten years from return of last execution in 1861. But we shall not rest our decision now on that ground, as there are others which sustain its vitality, and are equally applicable to the question of lien. The judgment may not be dormant, and yet the lien on land be lost by neglect to issue executions, or failing to record, etc.

Was there diligence sufficient to preserve the lien after February, 1861? The execution acts of 1840 and 1842, and the 1st Section of judgment act, before cited, of ninth of November, 1866 (Paschal's Digest, Art. 7005), are similar in giving liens on land in the county where judgment is rendered. They are also similar in the requirement of issue of execution within the year after rendition; but the acts of 1842 and 1866 do not contain the further provision of that act, that "due diligence be used to collect the same." The decisions under the act of 1840 have been, that after the first execution and year, there should be continuous reissues from term to term of the court. Any hiatus would be fatal to the lien, so that subsequent executions could not attach to lands sold after the judg-

ment. The first and only case arising and wholly decided under the act of 1842, which has fallen under observation, is Russell v. McCampbell, 29 Texas, 39. In the opinion is an expression to the effect that the same diligence is requisite by that act as had been required by the decisions under the act of 1840—that is, the issue of executions from term to term—and that it was believed such was the common law. This expression was avowedly made when not necessary to the decision of the case, which had already been put on a stronger and clearer ground. It is therefore deemed only the opinion of the justice who delivered it, and is only entitled to weight as such. While we entertain great respect for his opinion, we are not prepared to give assent to that view. The requirement of "due diligence to collect," was a strong expression of legislative intent. Its omission in the subsequent act may mean a change of that intent, and that a less degree of diligence should be required. Nor do we find that the common law of England had established such a rule; indeed, by the common law no lien on lands was given to a judgment for debt. Such judgment could only be enforced against the person, or the goods and chattels of the debtor, or the "rents and profits of his lands," or under statute by writ of elegit, which gave lien on a moiety of the debtor's freehold land, for possession and application of rents. (3 Cooley's Blackstone, 418, *et seq.*) The diligence required to preserve that lien was not so great as required by our statute. (2 Tidd's Practice, 935.) Those processes afford us no satisfactory guide for decision on this subject, and is unnecessary to our decision in this case. The objection to the failure to issue execution after February, 1861, is to be considered with reference to the condition of the State, its officers and people, at that period, and subsequently, which are historically, by legislative and executive action, and proceedings in all our courts, State and Fed-

eral, judicially known to us. In view of the political ex-
citement then prevailing, involving the highest interests
of all the people,—the war which immediately ensued,
and was continued until long after arms had been laid
down, and in a *quasi* form long after the President's
proclamation of peace, we cannot reasonably hold that
any creditor should be held to the strict rule of diligence
to preserve his rights as in times of quiet and peace.
A creditor who, in 1861, sought to enforce executions for
debt as rigidly as the law authorized, would have met
with little sympathy or aid.

We cannot ignore the then state of affairs, and cannot
in conscience hold there was laches or want of diligence
in not issuing execution from term to term of court.
Surely in such circumstances a delay of one year would
not be deemed laches. Within that period the stay law
of December 7, 1861, was enacted; was renewed and ex-
tended in December, 1863 ; enforced by military execu-
tive orders in 1865, and protracted by Convention of
1866; modified and renewed by Legislature of 1866; and
continued in effective and practical operation until Febru-
ary 24, 1868, when the unconstitutionality of such acts
was decided, in Jones v. McMahan, 30 Texas, 719, and
Luter v. Hunter, 30 Texas, 688. This latter case also de-
cided that the war suspended the laws of limitation. So
it has been held in several cases, that the diligence re-
quired to charge the drawer of a bill, or endorser of a prom-
issory note, by suit, was suspended by the stay laws of
1861 and 1863, until the courts were opened in Septem-
ber, 1865. These cases are all reviewed, and the correct
result attained, in Stratton v. Johnson, 36 Texas, 90. As
to the diligence required of judgment creditors to pre-
serve their liens and prevent dormancy, it was held, in
Phillips v. Lesser, 32 Texas, 741 ; Sessums v. Botts, 34
Texas, 335 ; and Cravens v. Wilson, 35 Texas, 52, that
the vigor and lien of judgments rendered in 1865 and 1866

were preserved by executions first issued in 1868, within one year from the decision of the Supreme Court on the stay law of 1866, and that the practical effect of that law excused the failure to issue execution within the year from judgment. The same principles were applied to the case of judgment in July, 1861, with stay of execution to February, 1862, on which no execution issued until early in 1868, as against judgments recovered in November, 1867 ; and it was held, that the judgment of 1861 did not become dormant by reason of the stay act of December, 1861, and subsequent stay measures, and that it took lien by virtue of the judgment act of November 9, 1866, which last point is further than is necessary to go in the present case. (Moore v. Letchford, 35 Texas, 185 ; see also Gardner v. Spivey, 35 Texas, 508.)

The same principles are also maintained and applied, as to the effect of the war and subsequent stay acts upon the rights of the creditor under a judgment, in March, 1861, upon which no execution was issued until January, 1869, in the case of Williams v. Murphy, 36 Texas, 167. In citing that case, however, we do not wish to be understood as approving what is stated there, and in other cases there cited, as to the effect of the act of 1860 being a repeal of the 12th Section of the execution act of 1842, and 2d Section of limitation act of 1841, which required an execution within the year to prevent dormancy of judgments, and also to preserve lien of judgments rendered before February 14, 1860. We do not perceive such manifest inconsistency between these acts as was expressed in Scogin v. Perry, 32 Texas, 21, and other cases following it.

Upon reason and authority, we are of opinion that appellants judgment and its lien were kept alive and in force by executions until February, 1861, and were preserved in force by the war and various ensuing stay measures, without further act by the creditor, until one

year after February, 1868, when those measures were finally decided unconstitutional. The judgment was not dormant, nor had the lien been lost, in 1864, when appellees purchased; nor when appellant paid it, after Harris' death, in June, 1868, as his surety, and thereby became subrogated to the rights of the creditor, Reagan. It follows, that the court below was right in overruling the demurrers, but erred in refusing relief on the evidence, and dismissing the suit. The judgment must, therefore, be reversed; but we are not so clearly satisfied with the evidence about the mandate in 1859, and subsequent executions. This court doubtless has power to reform when the cause is submitted on evidence, but is not required so to do; and it is deemed inadvisable to exercise such power where the evidence is not as clear as the party ought to have produced from the records, or secondary for them, and where no reason is shown or alleged why such evidence was not adduced.

In this view it becomes proper to notice the further defense of the appellee Lacy, as to the homestead of the debtor, Harris, on the land, and not liable to sale under the judgment. We think it clear that the debtor had the right to sell his homestead and acquire another with the proceeds, or otherwise, without thereby subjecting it to his general debts, or any lien not made specific by valid contract. The purchaser, Lacy, took good title for the two hundred acre homestead, and it is not liable to appellant's judgment.

The judgment of the court below, as between appellant and appellee, is reversed and remanded.

REVERSED AND REMANDED.