# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00499-CV

### Texas Parks & Wildlife Department, Appellant

**v.**

### Milburn Dearing, Kenneth Head, and Mike Warren, Individually and on Behalf of All Others Similarly Situated, Appellees

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. GN102867, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

This is an interlocutory appeal from the re-certification of a class action following this Court's reversal and remand of the original certification order. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(3) (West 1997 & Supp. 2006). Appellees Milburn Dearing, Kenneth Head, and Mike Warren, individually and on behalf of others similarly situated (collectively, Dearing), sued their employer, the Texas Parks & Wildlife Department, alleging a disparate-impact theory of age discrimination under chapter 21 of the Texas Labor Code in regard to the Department's reclassification of their game-warden positions. *See Texas Parks & Wildlife Dep't v. Dearing*, 150 S.W.3d 452, 466 (Tex. App.—Austin 2004, pet. denied) (*Dearing I*), *cert. denied*, 544 U.S. 960 (2005); *see also* Tex. Lab. Code Ann. § 21.051 (West 2006). The plaintiffs sought certification of a class of approximately 130 fellow game wardens whom they claim were similarly situated. Eighty-eight of the putative class members have since intervened as plaintiffs. The district court

denied a plea to the jurisdiction and summary-judgment motions asserted by the Department and certified the class.

In *Dearing I*, this Court affirmed the district court's ruling on the Department's plea to the jurisdiction but reversed its order certifying the class. The Court concluded that the district court lacked subject-matter jurisdiction to certify the class, and that Dearing's claim was not viable, because the labor code did not permit an age-discrimination claim based on a disparate-impact theory of liability. The Court construed section 21.122(b) of the labor code to mean that age-discrimination claims based on a disparate-impact theory of liability were available under the labor code to the same extent that such claims were available under the Age Discrimination in Employment Act of 1967 (ADEA). *Dearing I*, 150 S.W.3d at 465; *see* Tex. Lab. Code Ann. § 21.122(b) (West 2006); *see also* Age Discrimination in Employment Act, 29 U.S.C.A. §§ 621-634 (West 1998 & Supp. 2006). The Court thus looked to federal jurisprudence addressing that question and found persuasive the analysis by the Fifth Circuit in *Smith v. City of Jackson,* 351 F.3d 183, 195 (5th Cir. 2003), holding that the ADEA did not permit such claims. *Dearing I*, 150 S.W.3d at 465. Dearing filed a petition for review with the Texas Supreme Court, which was denied. He then sought writ of certiorari from the United States Supreme Court.

While Dearing's certiorari petition was pending, the Supreme Court affirmed the Fifth Circuit's judgment in *Smith*, but disagreed with its reasoning that claims based on a disparate-impact theory of liability are categorically unavailable under the ADEA. *See* 544 U.S. 228, 232-43 (2005) (plurality opinion); *id.* at 243 (Scalia, J., concurring) ("I agree with all of the Court's reasoning, but would find it a basis, not for independent determination of the disparate-impact question, but for

2

deferral to the reasonable views of the Equal Employment Opportunity Commission" that disparate-impact claims are permitted under the ADEA). The Supreme Court affirmed the Fifth Circuit's judgment on the bases that (1) the claimants had failed to identify sufficiently an employment practice within the city's pay plan that had an adverse impact on older workers; and (2) the city's plan was based on reasonable factors other than age. *Id*. at 242. Subsequently, the Supreme Court denied Dearing's certiorari petition. 544 U.S. 960 (2005).

After the Supreme Court denied certiorari, this case was remanded to the district court pursuant to this Court's mandate "for further proceedings consistent with [our] opinion." On remand—without amending his pleadings or introducing additional evidence—Dearing filed a motion to reinstate the original class certification order. The district court granted Dearing's motion, issuing an order incorporating its original certification order without change.

The Department now appeals the district court's order. For the reasons explained below, we reverse the order and remand for further proceedings consistent with this opinion.

## BACKGROUND

**The underlying dispute**

The factual background of these proceedings is detailed in *Dearing I*. 150 S.W.3d 452. The putative class members were at relevant times employed as game wardens by the Department. Originally, their job classifications ranged from "Game Warden I" through "Game Warden IV." Promotions within these classification levels were based on length of service and were made every four years. In 1994, the Department reclassified the game wardens who had accumulated over 16 years of service from "Game Wardens IV" to "Field Sergeant Game Wardens" and assigned

3

them additional duties. The following year, the legislature passed a pay-parity rider that prohibited the Department from compensating its state-commissioned peace officers "at a rate less than the rate paid by any other state agency to a state-commissioned peace officer performing similar duties." *See* Act of May 25, 1995, 74th Leg., R.S., ch. 1063, 1995 Tex. Gen. Laws 5242, 5857 (effective Sept. 1, 1995). The Department's executive director appointed a committee to study the pay-parity issue. The committee determined that Field Sergeant Game Wardens performed duties similar to those of sergeants employed by the Department of Public Safety and recommended increasing these game wardens' compensation to level C-7, the pay level of the DPS sergeants identified as their counterparts. In 1996, Field Sergeant Game Wardens received that raise.

The legislature subsequently added a new top tier to the game-warden job classification, "Game Warden V," adopted Salary Schedule C designating compensation for the position at the C-6 level, and specified that adoption of the salary schedule could not result in decreased pay for any classified employee. *See* Act of May 29, 1997, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 6341, 6345 (effective Sept. 1, 1997) (the pay rider). Legislative descriptions of the duties of Field Sergeant Game Wardens matched those of the new Game Wardens V and, when the bill took effect, the Department reclassified the Field Sergeant Game Wardens to Game Wardens V. Because the pay rider prohibited reduction of their salaries through the reclassification, the former Field Sergeant Game Wardens reclassified as Game Wardens V were "grandfathered" and continued to be paid at the C-7 rather than C-6 level.

In 1999, the legislature increased salaries for all Texas peace-officer positions. *See* Act of Apr. 23, 1999, 76th Leg., R.S., ch. 1589, 1999 Tex. Gen. Laws 5446, 6262-6263 (effective

Sept. 1, 1999). The Department reclassified the grandfathered Game Wardens V (the former Field Sergeant Game Wardens) to a new C-6 pay level, which had the effect of giving them a pay raise from $42,084 (the former C-7 level) to $44,600 (the new C-6 level). However, the new C-6 level pay was less than the new C-7 level pay of $50,600. Thus, it is alleged, the Former Field Sergeant Game Wardens received a reduction in pay and other benefits relative to other positions that remained at the C-7 level. It is further alleged that "[a]ll of the more than 130 Field Sergeant Game Wardens, save one, were over the age of 40 at the time of the reclassification."

**Proceedings below**

Dearing sued, alleging that because none of the other sergeant positions at the Department had been reclassified, the Department's reclassification of the former Field Sergeant Game Wardens from the C-7 to the C-6 level constituted unlawful age discrimination. *See* Tex. Lab. Code Ann. §§ 21.051 (prohibiting employers from discriminating against employees on basis of race, color, disability, religion, sex, national origin, or age), .101 (West 2006) (defining classification of persons protected against age discrimination as those age forty or older). Dearing also alleged breach of contract, sought a declaratory judgment that the Department violated the 1997 and 1999 appropriations acts, and sought mandamus to remedy the Department's reclassification of the former Field Sergeant Game Wardens from C-7 to C-6. Dearing requested certification of a class defined as "all Field Sergeant Game Wardens employed by the Texas Parks and Wildlife Department on September 1, 1999, who were reclassified from pay group C-7 to pay group C-6 and from Field Sergeant Game Warden to Game Warden V."

5

The Department filed a plea to the jurisdiction, asserting that the age-discrimination claim was barred because (1) Dearing's individual complaint had not been timely filed; (2) even assuming that Dearing's claim had been timely filed, none of the other plaintiffs had individually exhausted their administrative remedies before filing suit; and (3) the reclassification had been legislatively mandated, rationally related to a legitimate state interest, and not subject to an attack based on age discrimination.[1]  The Department also asserted that the breach-of-contract claim was barred by sovereign immunity, that mandamus would not lie because an adequate remedy at law was available, and that the declaratory-judgment claim did not independently create a basis for subject-matter jurisdiction.  The Department also sought summary judgment on the grounds that: (1) Dearing's complaint had not been timely filed; (2) Dearing's suit was barred by limitations; (3) the other class members had failed to exhaust administrative remedies; and (4) the reclassification had been legislatively mandated.  Dearing subsequently filed a cross-motion for summary judgment on his breach-of-contract, mandamus, and declaratory-judgment claims.

After a hearing, the district court granted the Department's plea to the jurisdiction as to Dearing's breach-of-contract, declaratory-judgment, and mandamus claims, but denied it as to his age-discrimination claims.  It also denied both parties' summary-judgment motions.  The court granted Dearing's motion for class-certification "under Tex. R. Civ. P. 42(b)(4)."  Its order incorporated a trial plan identifying "the issues remaining to be tried in this case" after its rulings on the Department's plea to the jurisdiction and the parties' summary judgment motions:

---

[1]  *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83-84 (2000).

a. Plaintiffs' disparate impact claims for age discrimination in violation of Tex. Labor Code Ann. § 21.051,

b. Defendants' affirmative defense that their actions were rationally related to a legitimate state interest,

c. Defendants' affirmative defense that they were required by law to take the actions that they did in 1999,

d. Defendants' affirmative defense that they would have taken the same actions that they did with regard to Plaintiffs . . . irrespective of the[ir] ages.

The plan did not elaborate on the elements of Dearing's disparate-impact claim or why it would best be tried as a class action other than to state: "The reclassification applied to all members of the class at the same time and affected all of them in the same manner. Thus, all of the proof and evidence relevant to this issue will be the same for all members of the class, so there is no need for separate procedures within the trial for individual plaintiffs on this issue." Nor did the plan explain how this claim would be tried other than to observe that, "Plaintiffs must first establish that the reclassification made the basis of this suit has a disproportionate effect on persons who were 40 years of age or older." The plan went on to provide, "If a directed verdict is not granted after the Plaintiffs' case in chief, then the affirmative defenses set out above will need to be tried," again observing that, "The reclassification applied to all members of the class at the same time and affected all of them in the same manner. Thus, all of the proof and evidence relevant to this issue will be the same for all members of the class, so there is no need for separate procedures within the trial for individual plaintiffs on this issue." The plan then stated that, "Damages for each individual member of the class will be a manner of mechanical calculation" and proceeded to detail different methodologies to determine damages for class members who had retired before the date of the

7

judgment and those who had not. The order set a trial date of June 16, 2003 and various discovery deadlines—all in the first half of 2003.

***Dearing I***

The Department appealed from the district court's order denying its plea to the jurisdiction and certifying the class.[2] In *Dearing I*, this Court affirmed the district court's denial of the Department's plea to the jurisdiction, concluding that Milburn Dearing had filed a timely complaint with the Texas Commission on Human Rights. *Dearing I*, 150 S.W.3d at 458-59.[3] Although the Department had presented undisputed jurisdictional evidence that no putative class member other than Dearing had individually filed a timely complaint, this Court permitted the other putative class members to "piggyback" onto Dearing's timely filed claim by "adopt[ing] the single-filing rule fashioned by federal courts." *Id.* at 459-60.

But the Court reversed the grant of class certification. It concluded that the sole claim for which the class was certified—a disparate-impact age-discrimination claim—was not available under the labor code, an issue that it regarded as going to both the viability of Dearing's claim and the subject-matter jurisdiction of the district court, as it controlled whether Dearing's claim came within the labor code's waiver of sovereign immunity for age-discrimination claims. *Id*. at 465-66

---

[2] Dearing filed a notice of appeal of the district court's ruling granting the Department's plea to the jurisdiction regarding his declaratory-judgment and mandamus claims, but not his breach-of-contract claim. He later withdrew this notice.

[3] We also held that the rule of *Kimel* did not extend to suits under state anti-discrimination laws and that "the Department has not pointed us to any legislative or statutory references from which we can conclude that its reclassification actions were required by law." *Dearing I*, 150 S.W.3d at 460-61.

8

& n.8; *see State Farm Mut. Auto. Ins. Co. v. Lopez*, 156 S.W.3d 550, 557 (Tex. 2004). This Court construed section 21.122(b) of the code to "state[] that disparate-impact claims are available for age discrimination in this state only if they are available under the ADEA." *Dearing I*, 150 S.W.3d at 465. Accordingly, it looked to federal jurisprudence on that issue and found persuasive the analysis of the Fifth Circuit in *Smith* that disparate-impact age-discrimination claims were unavailable under the ADEA. Because the Court "reverse[d] the order certifying the class on jurisdictional grounds," it did not address issues raised by the Department challenging whether the plaintiffs had met the other requirements for class certification under rule 42, such as numerosity, commonality, predominance, and superiority. *Id.* at 466 n.8.

Dearing then filed a petition for review in the Texas Supreme Court, which was denied, and then filed a petition for writ of certiorari in the United States Supreme Court. While Dearing's certiorari petition was pending, the United States Supreme Court issued its *Smith* decision. Because *Smith* provides the backdrop for many of the issues the parties present in this proceeding, it is helpful to review it in some detail.

**The ADEA and *Smith***

*Smith* construed the ADEA's general prohibition against employment discrimination, which provides:

> It shall be unlawful for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's age . . . .

29 U.S.C.A. § 623(a) (West 1998). Section 623(a) was modeled after section 703(a) of Title VII of the Civil Rights Act of 1964 and is substantively identical "[e]xcept for substitution of the word 'age' for the words 'race, color, religion, sex or national origin.'" *Smith*, 544 U.S. at 233; *see* 42 U.S.C.A. § 2000e-2 (West 2003). The United States Supreme Court has recognized two basic theories of liability under section 703(a) of title VII: disparate treatment, which requires proof that an employer's actions were actually motivated by the employee's protected classification, and disparate impact, which does not require proof of motive. Disparate-impact claims of employment discrimination challenge "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another . . . ." *Smith*, 544 U.S. at 239 (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977)).

The Supreme Court first recognized the disparate-impact theory of liability under title VII in *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), which involved a challenge to facially race-neutral educational requirements and intelligence tests. The Court assumed that the employer had not adopted the requirements with intent to discriminate, but nonetheless held that good faith "does not redeem employment procedures . . . that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Id.* at 432. It relied principally on what it perceived to be Congress's intent in enacting title VII: "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees" and prohibit "practices, procedures, or tests neutral on their face, and even neutral

10

in terms of intent . . . if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 429-30. The Court explained that, "What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Id.* at 431. "The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.*

Although *Griggs* relied primarily on the policy goals of title VII, the Supreme Court subsequently noted that "our holding represented the better reading of the statutory text as well." *Smith*, 544 U.S. at 235 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988)). Specifically, the Court emphasized that section 703(a)(2) prohibits not only actions that "limit, segregate, or classify" persons, but also any actions that "deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's race," color, religion, sex, or national origin." *Id.* (citing *Watson*, 487 U.S. at 991). This statutory text, the supreme court has concluded, "focuses on the *effects* of the action on the employee rather than the motivation for the actions of the employer." *Id.* at 236.

Prior to *Smith*, disparate-treatment claims were clearly actionable under the ADEA, *see Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609-10 (1993), but it was uncertain whether disparate-impact claims were similarly actionable. In the aftermath of *Griggs*, numerous federal appellate courts had assumed that given the parallel language in the two statutes, the disparate-

11

impact theory under title VII would also be available under the ADEA.[4]  These decisions had

prompted judicial and scholarly debate.  *See Markham v. Geller*, 451 U.S. 945 (1981) (Rehnquist,

J., dissenting from denial of certiorari) (criticizing court of appeals decision that had applied the title

VII disparate-impact analysis to the ADEA); *Metz v. Transit Mix, Inc.*, 828 F.2d 1202, 1216-20 (7th

Cir. 1987) (Easterbrook, J., dissenting); *see generally* Douglas C. Herbert & Lania Schweiker

Shelton, *A Pragmatic Argument Against Applying the Disparate Impact Doctrine in Age*

*Discrimination Cases*, 37 S. Tex. L. Rev. 625, 627 nn.6-7 (collecting cases and articles).  In its 1993

*Hazen Paper* decision—an ADEA disparate-treatment age-discrimination case—the Supreme Court

emphasized that "we have never decided whether a disparate impact theory of liability is available

under the ADEA, and we need not do so here."  507 U.S. at 610 (citation omitted).  Three

justices—Rehnquist, Kennedy, and Thomas—concurred to point out that "nothing in the Court's

opinion should be read as incorporating in the ADEA context the so-called 'disparate impact' theory

of Title VII" and further observed that "there are substantial arguments that it is improper to carry

over disparate impact analysis from Title VII to the ADEA."  *Id*. at 617-18 (Kennedy, J., concurring).

*Hazen Paper* influenced many federal courts to begin holding that disparate-impact claims were not

available under the ADEA.  *See Smith*, 544 U.S. at 237; *see also Dearing I*, 150 S.W.3d at 462

---

[4] *See Maresco v. Evans Chemetics*, 964 F.2d 106, 115 (2d Cir. 1992); *MacPherson v. University of Montevallo*, 922 F.2d 766, 771 (11th Cir. 1991); *Wooden v. Board of Ed. of Jefferson County*, 931 F.2d 376, 379 (6th Cir.1991); *Arnold v. United States Postal Service*, 863 F.2d 994, 998 (D.C. Cir. 1988) (assuming disparate-impact theory); *Blum v. Witco Chemical Corp*., 829 F.2d 367, 372 (3d Cir. 1987)*; Holt v. Gamewell Corp*., 797 F.2d 36, 37 (1st Cir. 1986); *Palmer v. United States*, 794 F.2d 534, 536 (9th Cir. 1986); *Monroe v. United Airlines*, 736 F.2d 394, 404 n.3 (7th Cir. 1984); *Dace v. ACF Industries*, 722 F.2d 374, 378 (8th Cir. 1983), *modified*, 728 F.2d 976 (1984) (per curiam).

("*Hazen* cast some doubt on the future of disparate-impact claims."). In *Smith*, the Fifth Circuit followed that trend, invoking many of the common arguments advanced by the judicial and scholarly opponents of extending title VII's disparate-impact theory to the ADEA. *Smith*, 351 F.3d at 463-65; *see generally* Herbert & Shelton, *supra*, at 636-50. We analyzed these arguments in *Dearing I*. *See* 150 S.W.3d at 463-65.

*Smith* involved facts similar to those in this case: a group of police and public-safety officers who were over the age of forty and employed by the City of Jackson, Mississippi sued the city under the ADEA, complaining that across-the-board salary increases—which were designed to raise the starting salaries of police officers up to the regional average—resulted in salary increases that were proportionately greater for officers with less than five years' service, most of whom were under the age of forty. *Smith,* 544 U.S. at 231. Although all police officers received raises, the claimants alleged that the city deliberately discriminated against them because of their age (the disparate treatment claim), and the pay plan adversely affected them because of their age (the disparate-impact claim). *Id.*

In holding that the officers' disparate-impact claims were not available under the ADEA, the Fifth Circuit acknowledged that the ADEA closely paralleled title VII, but with an important difference: the ADEA, unlike title VII, explicitly provided that an employer may "take any action otherwise prohibited . . . where the differentiation is based on reasonable factors other than age." *Smith*, 351 F.3d at 193-94; *see* 29 U.S.C.A. § 623(f)(1). The court reasoned that this "RFOA" provision would render the ADEA's general prohibition against age discrimination a nullity to the extent that it prohibited disparate-impact discrimination and cause the general

13

prohibition to "become nothing more than a bromide to the effect that 'only age discrimination is age discrimination.'" *Smith*, 351 F.3d at 190 (quoting *Mullin v. Raytheon Co.*, 164 F.3d 696, 702 (1st Cir. 1999)). Thus, the Fifth Circuit concluded that the ADEA's general age-discrimination prohibition must permit only the disparate-treatment liability theory. *Id.* at 190.

The Fifth Circuit also pointed to broader differences between the congressional policy objectives underlying the ADEA versus those of title VII. *Id.* at 195. During its deliberations preceding the enactment of title VII, Congress had considered and rejected the inclusion of older workers among the classes protected from employment discrimination, but had authorized the Secretary of Labor to prepare a study "of the factors which might tend to result in discrimination in employment because of age and the consequences of such discrimination on the economy and individuals affected." *Smith*, 544 U.S. at 232. Thereafter,

> The ADEA was enacted after the Secretary of Labor issued a report on age discrimination recommending that Congress ban arbitrary discrimination, such as disparate treatment based on stereotypical perceptions of the elderly, but that factors affecting older workers, such as policies with disparate impact, be addressed in alternative ways. *Smith*, [544 U.S.] at 195; *Mullin*, 164 F.3d at 702-03; *see* U.S. Dep't of Labor, The Older American Worker: Age Discrimination in Employment 2, 6, 21-25 (1965) (Congress should prohibit "arbitrary discrimination" based on age and age stereotypes, but factors that "affect older workers more strongly, as a group, than they do younger workers" should be addressed through programmatic measures to improve opportunities for older workers.). Title VII, on the other hand, had a broad remedial purpose: To "achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs*, 401 U.S. at 429-30, 91 S.Ct. 849, quoted in *Smith*, at 194-195; *Adams* [*v. Florida Power Co.*], 255 F.3d [1322,]1325-26 [11th Cir. 2001)] ("history of the ADEA differs from the legislative history of Title VII, which the Supreme Court in *Griggs* relied on to find a cause of action for disparate impact"); *Ellis* [*v. United Airlines, Inc.*], 73 F.3d [999,] 1008 [10th Cir. 1996)] ("legislative history of the ADEA suggests it was not enacted to address disparate impact claims"). "The cornerstone of *Griggs*'s holding that disparate impact is

14

cognizable under Title VII is thus the link between the history of educational discrimination on the basis of race and the use of that discrimination to continue to disadvantage individuals on the basis of their race." *Smith*, at 195 (citing *Griggs*, 401 U.S. at 432, 91 S.Ct. 849). "[A]bsent from the scope of the ADEA are the historical and remedial concerns that, in the Title VII context, led to the recognition of disparate impact claims directed at overcoming the consequences of past societal discrimination."

*Dearing I*, 150 S.W.3d at 463-64.

Also, as we observed in *Dearing I*, federal courts had attributed some significance to differences between subsequent amendments to the ADEA and title VII. *See id*. at 464-65. Following *Griggs*, an elaborate body of case law developed under title VII concerning the standards for proving disparate-impact liability and any proffered "business necessity." In *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989), the Supreme Court held that to establish a prima facie case of disparate-impact race discrimination under title VII, a plaintiff was required to (1) isolate and identify the specific employment practice challenged; (2) demonstrate any observed statistical disparity that the practice has on a protected class; and (3) demonstrate a causal link between the identified practice and the demonstrated disparity. *Id*. at 655-56. Assuming that a plaintiff could successfully assert a prima facie case under this standard, *Wards Cove* held that the burden of production shifted to the employer to produce evidence of a business necessity for the use of the practice in question. *Id*. at 658-59. That inquiry entailed consideration of whether the challenged practice served, in a "significant" (but not necessarily "essential" or "indispensable") way, the employer's "legitimate" employment goals and whether there were available alternative practices to achieve the same business ends. *Id*. *Wards Cove* further held that while the employer had the burden of production in this phase, the ultimate burden of persuasion remained with the plaintiff.

15

*Id*. at 659. The Supreme Court explained that "the ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times* . . . for it is he who must prove that it was because of such individual's race, color, etc., that he was denied a desired employment opportunity." *Id*. at 659-60 (citations omitted). *Wards Cove* was controversial, *see Smith*, 544 U.S. at 240 (characterizing *Wards Cove* as "narrowly constru[ing] the employer's exposure to liability on a disparate-impact theory"), and Congress responded to it and other controversial Supreme Court employment-discrimination decisions by enacting the Civil Rights Act of 1991. Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. Among other changes, Congress added a new subsection (k) to title VII's section 703 that codified the disparate-impact theory of liability for the first time, clarified the requirements for establishing a prima facie case, placed on the defendant the burden of both production and persuasion regarding business necessity, and made plaintiffs' proof of alternative employment practices easier. Civil Rights Act of 1991, Pub. L. No. 102-166, sec. 105, § 703, 105 Stat. 1071, 1074-75 (current version at 42 U.S.C.A. § 2000e-2(k)). However, while amending other portions of the ADEA, Congress did not make amendments to section 623(a) that corresponded to its amendments to title VII, section 723(a). Congress's insertion of a specific provision into title VII governing disparate-impact claims while omitting it from the ADEA—even while the ADEA was undergoing amendments at the same time, in the same legislation—was viewed by some federal courts as consistent with Congress's broader intent to preclude such a claim under the ADEA. *See Dearing*, 150 S.W.3d at 464.

16

The Supreme Court granted certiorari in *Smith* to address "whether the 'disparate-impact' theory of recovery announced in *Griggs* . . . , for cases brought under Title VII of the Civil Rights Act of 1964, is cognizable under the ADEA." *Smith*, 544 U.S. at 230. The Court stated that the textual parallels between section 703(a)(2) of title VII and section 623(a)(2) of the ADEA made *Griggs* a "precedent of compelling importance" and "strongly suggests that a disparate-impact theory should be cognizable under the ADEA." *Id.* at 233-37. In fact, the Court observed, federal appellate courts had "uniformly" interpreted the ADEA during the decades following *Griggs* as authorizing recovery on a disparate-impact theory. *Id.* at 236-37 & n.8 (collecting cases). Lower courts had ceased to do so, the Supreme Court suggested, based on a misunderstanding of its *Hazen Paper* decision, and that "there is nothing in our opinion in *Hazen Paper* that precludes an interpretation of the ADEA that parallels our holding in *Griggs*." *See id.* at 237-38 (citing *Hazen Paper*, 507 U.S. at 612).

However, the Supreme Court also recognized the important textual differences between the ADEA and title VII. In particular, the Court observed that the ADEA's RFOA provision "significantly narrows its coverage" by permitting "otherwise prohibited" action "where the differentiation is based on reasonable factors other than age." *Smith*, 544 U.S. at 233 (quoting 29 U.S.C.A. § 623(f)(1) (West 1999)). The RFOA provision, as the *Smith* Court observed, reflected legislative origins of the ADEA that differed from those of title VII.

> Congress' decision to limit the coverage of the ADEA by including the RFOA provision is consistent with the fact that age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment. To be sure, Congress recognized that this is not always the case, and that society may perceive those differences to be larger or

17

more consequential than they are in fact. However, as Secretary [of Labor] Wirtz noted in his report, "certain circumstances . . . unquestionably affect older workers more strongly as a group than they do younger workers." Wirtz Report 28. Thus, it is not surprising that certain employment criteria that are routinely used may be reasonable despite their adverse impact on older workers as a group. Moreover, institutional discrimination on the basis of age has not occurred at the same levels as discrimination against those protected by Title VII. While the ADEA reflects Congress' intent to give older workers employment opportunities whenever possible, the RFOA reflects this historical difference.

*Id.* at 240-41. But the Supreme Court drew different inferences from these distinctions regarding Congress's intent than had the courts of appeals. In the Supreme Court's view, the RFOA confirmed, rather than negated, Congress's intent to permit disparate-impact claims under the ADEA. *Id.* at 238. The Court reasoned that if the ADEA had permitted only disparate-treatment claims and an employer in fact had acted based on a factor other than age, the RFOA provision would have been redundant and unnecessary because the employer's action would not have been "otherwise prohibited" in the first place. *Id.* It suggested that "[i]t is . . . in cases involving disparate-impact claims that the RFOA provision plays its principal role by precluding liability if the adverse impact was attributable to a nonage factor that was 'reasonable.' Rather than support an argument that disparate impact is unavailable under the ADEA, the RFOA provision actually supports the contrary conclusion." *Id.* at 239.

The Supreme Court held that "[t]he text of the statute, as interpreted in *Griggs*, the RFOA provision, and the EEOC regulations [holding that a disparate-impact claim was available under the ADEA] all support petitioner's view," and that it "was error for the Court of Appeals to hold that the disparate-impact theory of liability is categorically unavailable under the ADEA." *Id.* at 240. Nonetheless, the Court emphasized that "[t]wo textual differences between the ADEA and

18

Title VII make it clear that even though both statutes authorize recovery on a disparate-impact theory, the scope of disparate-impact liability under ADEA is narrower than under Title VII." *Id.* The first was the RFOA provision. *Id.* The second was Congress's amendments to title VII—but not to the ADEA—in the Civil Rights Act of 1991. *Id.* Because of the latter distinction, the *Smith* Court reasoned, "*Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable under the ADEA." *Id.*

The Supreme Court concluded that the plaintiffs had failed to meet *Wards Cove's* requirements for establishing a prima facie case of disparate-impact age discrimination:

> [P]etitioners have done little more than point out that the pay plan at issue is relatively less generous to older workers than to younger workers. They have not identified any specific test, requirement, or practice within the pay plan that has an adverse impact on older workers. As we held in *Wards Cove*, it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is "'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" 490 U.S. at 656 (emphasis added) (quoting *Watson*, 487 U.S. at 994). Petitioners have failed to do so. Their failure to identify the specific practice being challenged is the sort of omission that could "result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances . . . .'" 490 U.S. at 657.

*Id.* at 241. The Court then stated, "not only did petitioners thus err by failing to identify the relevant practice, but it is also clear from the record that the City's plan was based on reasonable factors other than age." *Id.* The city had perceived a need to raise the salaries of junior officers to make them competitive with comparable positions in the market. *Id*. at 242. Older officers, who tended to occupy more senior positions, on average received smaller increases when measured as a percentage of their salary. *Id*. The Court concluded that the disparate impact was attributable to the city's

19

decision to give raises based on seniority and position, and the city's reliance on these factors was "unquestionably reasonable," given its goal of raising employees' salaries to make them comparable with those in surrounding communities. *Id.* The Court held that the city's decision to grant a larger raise to lower-echelon employees to establish salaries that were equivalent to those of police forces in surrounding communities was based on a "reasonable factor other than age" and was responsive to the city's legitimate goal of retaining police officers. *Id.* On this basis, the Supreme Court affirmed the judgment of the Fifth Circuit.

The Supreme Court subsequently denied Dearing's petition for certiorari. Thereafter, our mandate to the district court in *Dearing I* issued.

**Proceedings after remand**

On remand, Dearing filed a motion to reinstate the district court's original class-certification order, relying on the same underlying petition and evidence, without modification or amendment, on which the court had originally certified the class. The district court granted the motion, stating simply that its prior certification order, which was attached, "is hereby reinstated." The court did not prepare findings of fact and conclusions of law, nor did the Department request it to do so. The Department appeals this order.

**DISCUSSION**

In five issues, the Department contends that the district court abused its discretion in reinstating its prior order granting class certification. It argues that: (1) the district court's re-certification of the class based on the same pleadings, evidence, and trial plan conflicted with this

20

Court's mandate in *Dearing I*; (2) if we revisit *Dearing I* in light of the Supreme Court's intervening *Smith* decision, we should hold that the labor code permits disparate-impact age-discrimination claims subject to the same standards of proof identified in *Smith*; (3) because the district court's trial plan did not address each element required by *Smith* and the ADEA, among other defects, the district court abused its discretion in certifying the class; and (4) because Dearing has not, and cannot, plead a proper disparate-impact claim under these standards, not only was certification an abuse of discretion, but we should proceed to hold that Dearing's claim is barred by sovereign immunity and dismiss it. In its fifth issue, the Department urges that if the Court revisits *Dearing I* to address the effect of *Smith*, it should also revisit *Dearing I*'s holdings regarding exhaustion-of-remedies requirements and hold that Dearing and the putative class members failed to exhaust administrative remedies.

**Class-certification requirements and standard of review**

On remand, the decision by the district court to re-certify the class was governed by rule of civil procedure 42, as amended in October 2003. Tex. R. Civ. P. 42; *see BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 777 n.10 (Tex. 2005).[5] Rule 42(a) states the general class-certification prerequisites of (1) numerosity—"the class is so numerous that joinder of all members is impracticable"; (2) commonality—"there are questions of law or fact common to the class"; (3) typicality—"the claims and defenses of the representative parties are typical of the claims or defenses of the class"; and; (4) adequacy of representation—"the representative parties will fairly

---

[5] *But see* Tex. R. Civ. P. 42(i), (j).

and adequately protect the interests of the class." Tex. R. Civ. P. 42(a); *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 438 (Tex. 2007) (citing *Southwest Refining Co. v. Bernal*, 22 S.W.3d 425, 435 (Tex. 2000)). Additionally, a class action must satisfy at least one of the requirements in rule 42(b). The district court's re-certification order (which, in turn, merely incorporates its original, February 2003 certification order without modification) purports to be based on "Texas Rule of Civil Procedure 42(b)(4)." Rule "42(b)(4)" was eliminated in the subsequent amendments to rule 42 in October 2003, but its substance is reflected in current rule 42(b)(3), which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Tex. R. Civ. P. 42(b)(3). Rule 42(b)(3) contains a non-exhaustive list of factors to aid courts in determining whether rule 42(b)(3) certification is appropriate: (A) the interest of class members in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by class members; (C) the desirability or undesirability of concentrating the litigation or the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of the class action. *Id.*

The Texas Supreme Court has rejected a "certify now and worry later approach" and has instead required courts to "perform a rigorous analysis before ruling on class certification to determine whether all prerequisites to certification have been met." *Bernal*, 22 S.W.3d at 435. A proper analysis requires courts to "go beyond the pleadings" and identify the substantive issues that will control the litigation in order to discern which issues will predominate. *Peake*, 178 S.W.3d at

22

777. Trial courts must resolve disputes affecting the underlying substantive law prior to certification "as courts can hardly evaluate the claims, defenses or applicable law without knowing what the law is." *Compaq Computer Corp. v. Lapray,* 135 S.W.3d 657, 672 (Tex. 2004). The impact of recent cases affecting the controlling substantive law must be considered. *See Union Pacific Res. Group, Inc. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003). The supreme court has further instructed us that dispositive issues going to the viability of the class claims should be resolved by the trial court before certification is considered. *Lopez*, 156 S.W.3d at 557.

Trial plans are required in every order certifying a class "'to allow reviewing courts to assure that all requirements for certification under Rule 42 have been satisfied.'" *Peake*, 178 S.W.3d at 778 (quoting *Lopez*, 156 S.W.3d at 556). "The formulation of a trial plan assures that a trial court has fulfilled its obligation to rigorously analyze all certification prerequisites and understands the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id*. The trial-plan requirement is now codified in rule 42(c)(1)(D):

An order granting or denying certification under Rule 42(b)(3) must state:

(i)      the elements of each claim or defense asserted in the pleadings;

(ii)      any issues of law or fact common to the class members;

(iii)      any issues of law or fact affecting only individual class members;

(iv)      the issues that will be the object of most of the efforts of the litigants and the court;

(v)      other available methods of adjudication that exist for the controversy;

23

(vi)     why the issues common to the members of the class do or do not predominate over individual issues;

(vii)    why a class action is or is not superior to other available methods for the fair and efficient adjudication of the controversy; and

(viii)   if a class is certified, how the class claims and any issues affecting only individual members, raised by the claims or defenses asserted in the pleadings, will be tried in a manageable, time efficient manner.

Tex. R. Civ. P. 42(c)(1)(D).

We review a trial court's order certifying a class for abuse of discretion, but we do not indulge every presumption in favor of the trial court's ruling. *Schein v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002). "A trial court has discretion to rule on class certification issues, and some of its determinations—like those based on its assessment of the credibility of witnesses, for example—must be given the benefit of the doubt. But the trial court's exercise of discretion cannot be supported by every presumption that can be made in its favor." *Id.* Instead, "actual, not presumed, conformance with [rule 42] remains . . . indispensable." *Bernal*, 22 S.W.3d at 435. We must ensure that the district court performed the required "rigorous analysis" before ruling on class certification, as manifested in a detailed, thorough trial plan. *Peake*, 178 S.W.3d at 778.

**The effect of *Dearing I*'s mandate**

In its first issue, the Department argues that the district court abused its discretion in re-certifying the class on the same pleadings, evidence, and trial plan on which it had relied in *Dearing I*, in derogation of our mandate. We agree with the Department.

24

The mandate is the formal command from an appellate court commanding the lower court to comply with the appellate court's judgment. *See* Tex. R. App. P. 51.1(b), 65.2; *In re Grossnickle*, 115 S.W.3d 238, 243 (Tex. App.—Texarkana 2003, orig. proceeding); *Lewelling v. Bosworth*, 840 S.W.2d 640, 642-43 (Tex. App.—Dallas 1992, orig. proceeding); *Dixie Gas & Fuel Co. v. Jacobs*, 66 S.W.2d 446, 448 (Tex. Civ. App.—Beaumont 1933, writ dism'd w.o.j.) (citing *Black v. Epperson*, 40 Tex. 162, 172-73 (Tex. 1874)). Upon receiving the appellate court's mandate, the lower court has a mandatory, ministerial duty to enforce the appellate court's judgment. *See* Tex. R. App. P. 51.1(b); *Grossnickle*, 115 S.W.3d at 243. It has no discretion to review, interpret, or enforce the mandate but, instead, must carry out the mandate. *Grossnickle*, 115 S.W.3d at 243.

This Court's mandate in *Dearing I* recited its judgment that "the portion of the [district] court's order pertaining to class certification is reversed, and that part of the cause is remanded for further proceedings consistent with this opinion. The remainder of the order is affirmed." For further guidance, the district court was obligated to look to the Court's opinion. *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986) ("[C]ourts should look not only to the mandate itself, but also to the opinion of the court."). The mandate concluded with, "we command you to observe the order of our Court of Appeals in this behalf and in all things have the order duly recognized, obeyed, and executed."

This Court has not withdrawn its mandate, nor has the judgment underlying it been reversed or vacated by a higher appellate court.[6] Our command to the district court to conduct

---

[6] In fact, after issuing its *Smith* opinion, the Supreme Court did not vacate or otherwise disturb our *Dearing I* judgment in light of *Smith*, but denied certiorari. *Dearing*, 540 U.S. 960 (2005).

further proceedings in accordance with our *Dearing I* opinion thus remains effective unless and until we instruct it otherwise. Because the district court was bound to apply *Dearing I*'s holdings that Dearing's claim was not viable and that certification was thus inappropriate, the district court abused its discretion in re-certifying the class on the same record.

The district court may have perceived that *Smith* nonetheless undermined a central premise of *Dearing I* and rendered this Court's judgment erroneous. If so, it is understandable that the district court, perceiving a choice between the rationale expressed in an opinion of our nation's highest court versus one of this state intermediate appellate court, may have seen fit to apply the higher court's analysis. Such a view, however, would overlook the implications of both our mandate and the law-of-the-case doctrine.

Under the law-of-the-case doctrine, a court of appeals is ordinarily bound by its initial decision on a question of law if there is a subsequent appeal in the same case. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003); *see also Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006) ("[T]he 'law of the case' doctrine is that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." (citing *Hudson*, 711 S.W.2d at 630)). "By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency. The doctrine is based on public policy and is aimed at putting an end to litigation." *Briscoe*, 102 S.W.3d at 716.

The law-of-the-case doctrine does not extend to questions of fact, nor does it necessarily apply when either the issues or the facts presented in subsequent appeals are not

substantially the same as those involved on the first trial. *Hudson*, 711 S.W.2d at 630. Thus, as the Department suggests, Dearing "could have redrawn [his] petition and asked the trial court to certify a class based on a claim under the *Smith* standard; in that case, the court's mandate would not have been an obstacle because the certification would be different." That is not the case here, however. The district court re-certified the class relying on the same underlying pleadings, trial plan, and evidence on which it had originally certified the class.

Nonetheless, "[a] decision rendered on an issue before the appellate court does not absolutely bar re-consideration of the same issue on a second appeal," but "[a]pplication of the doctrine lies within the discretion of the court, depending on the particular circumstances surrounding that case." *Id.* A longstanding exception to the law-of-the-case doctrine (or instance when courts will exercise their discretion not to apply it) is where the appellate court concludes, on the second appeal, that its original decision was "clearly erroneous." *Id.* (citing *Galveston, Harrisburg & San Antonio Ry. Co. v. Faber*, 8 S.W. 64, 65 (Tex. 1888)). The rationale underlying this exception is that:

> It would be unthinkable [for the court] after having . . . reconsidered the case, and arrived at the conclusion that the opinion on the former appeal was clearly erroneous, to hold that it is bound by considerations of consistency to perpetuate that error. Our duty to administer justice under the law, as we conceive it, outweighs our duty to be consistent.

*Id.* (citing *Connecticut Gen. Life Ins. Co. v. Bryson*, 219 S.W.2d 799, 800 (Tex. 1949)). Under this exception, our sister courts have revisited, on appeals after remand, prior decisions called into question by intervening higher-court decisions. *See In re Estate of Chavana*, 993 S.W.2d 311, 315-

27

17 (Tex. App.—San Antonio 1999, no pet.); *McCrea v. Cubilla Condo. Corp.*, 769 S.W.2d 261, 262-63 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

Thus, while the law-of-the-case doctrine contemplates situations where prior appellate court decisions on legal questions should be reconsidered in appeals after remand, it is the appellate court—not the lower court—who decides whether it is appropriate to do so. We sustain the Department's first issue.

**Revisiting *Dearing I***

Dearing urges us to revisit *Dearing I* in light of *Smith* and affirm the district court's order as consistent with the current state of the law. We agree that we would effectuate the policies underlying the law-of-the-case doctrine by revisiting certain aspects of *Dearing I* and should exercise our discretion to do so.

### *Disparate-impact age-discrimination claims under the labor code*

When previously concluding that Dearing's disparate-impact age-discrimination claim was not viable and that certification was therefore an abuse of discretion, this Court relied on two basic premises: (1) the Fifth Circuit's analysis in *Smith* was "persuasive" regarding whether disparate-impact claims are available under the ADEA; and (2) section 21.122(b) of the labor code means that "disparate-impact claims are available for age discrimination in this state only if they are available under the ADEA." *Dearing I*, 150 S.W.3d at 465. Section 21.122(b) of the labor code provides:

28

> To determine the availability of and burden of proof applicable to a disparate impact case involving age discrimination, the court shall apply the judicial interpretation of the Age Discrimination in Employment Act of 1967 and its subsequent amendments (29 U.S.C. Section 621 et seq.).

Tex. Lab. Code Ann. § 21.122(b). The Department had argued that section 21.122 required us to apply to the labor code the then-prevailing view of the Fifth Circuit and other federal courts that the ADEA did not permit disparate-impact claims. Dearing had sought to distinguish these federal decisions, emphasizing that many had rested on the view that the ADEA's RFOA provision manifested Congress's intent to prohibit disparate-impact claims under that statute. *See Dearing I*, 150 S.W.3d at 463-64. Dearing pointed out that the legislature had patterned the labor code's general employment discrimination prohibition after section 703(a) of title VII[7] and had even codified *Griggs*'s "business necessity" limitation,[8] but has never explicitly enacted a counterpart to

---

[7] The Texas Labor Code's general prohibition against employment discrimination states:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1)  fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2)  limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Lab. Code Ann. § 21.051 (West 2006). Section 21.051 "is substantively identical to its federal equivalent in Title VII," but adds age and disability to the protected categories. *Quantum Chem. Co. v. Toennies*, 47 S.W.3d 473, 475 (Tex. 2001); *cf.* 42 U.S.C.A. § 2000e-2 (West 2003).

[8] When enacting the statutory predecessor to chapter 21 of the labor code, the 1983 Texas Commission on Human Rights Act (TCHRA), the legislature included the following provision:

29

the ADEA's RFOA provision. While acknowledging the integral role of the RFOA in the federal ADEA cases on which it relied, *see id.*, this Court did not consider the labor code's omission of such a provision to be significant. It dismissed Dearing's arguments as "ignor[ing] section 21.122, which states that disparate-impact claims are available for age discrimination in this state only if they are available under the ADEA." *Id.* at 465.

The Court added that section 21.122 "specifically mirrored" the textual distinctions between the ADEA and title VII following the 1991 Civil Rights Act amendments. *Id.* Specifically, following the 1991 amendments, the legislature had made corresponding amendments to Texas law that tracked the new subsection (k)(1) of title VII, section 703, but made these provisions applicable solely to claims for disparate-impact discrimination involving protected categories other than age. Act of May 14, 1993, 73d Leg., R.S., ch. 276, § 5, 1993 Tex. Gen. Laws 1285, 1287 (current version at Tex. Lab. Code Ann. § 21.122(a), (c)-(d) (West 2006))*; cf.* 42 U.S.C.A. § 2000e-2(k)(1).

In the aftermath of *Smith*, the Department concedes that disparate-impact claims may be available under the ADEA, and that—consistent with its position in *Dearing I*—section 21.122(b) incorporates this principle to govern such claims under the labor code. But the Department urges

---

Notwithstanding any other provision of this article, it is not an unlawful employment practice . . . .

(7)    for an employer to engage in any practice that has a discriminatory effect and that would otherwise be prohibited by this Act if the employer establishes that the practice is not intentionally devised or operated to contravene the prohibitions of this Act and is justified by business necessity.

Commission on Human Rights Act, 68th Leg., 1st C.S., ch. 7, § 5.07(7), 1983 Tex. Gen. Laws 37, 49 (current version at Tex. Lab. Code Ann. § 21.115 (West 2006)).

that our ultimate holdings in *Dearing I* were correct because the district court still abused its discretion in certifying the class. Central to this contention is the argument that the Department advances in its second issue: that section 21.122(b) incorporates into the labor code not only *Smith*'s holdings regarding the availability of disparate-impact claims under the ADEA, but also its analysis of the plaintiffs' burden of proof. Specifically, the Department urges that *Wards Cove* governs the standards Dearing must meet to establish a prima facie disparate-impact age-discrimination case and imposes a burden-shifting framework for addressing any justifications the Department proffers. Moreover, it asserts that section 21.122(b) incorporates the ADEA's RFOA limitation, as interpreted by *Smith*, into the labor code. *See Smith*, 544 U.S. at 243 ("Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement."). Relatedly, the Department argues that its RFOA justification is addressed in the same manner under the ADEA as was the business-necessity justification under *Wards Cove*—the defendant has the burden of production, but the plaintiff retains the ultimate burden of proof to prove the unreasonableness of any proffered RFOA. Based on these contentions, the Department complains in its third issue that the trial plan on which certification was based was defective because it failed to properly address the elements of Dearing's disparate-impact age-discrimination claim and the RFOA justification. *See* Tex. R. Civ. P. 42(c)(1)(D); *Peake*, 178 S.W.3d at 777; *Hankins,* 111 S.W.3d at 72.

Dearing's arguments largely parallel those that he advanced in *Dearing I*, emphasizing the textual similarities between section 21.051(a)(2) of the labor code, section 703(a)(2)

31

of title VII, and section 623(a)(2) of the ADEA; the legislature's omission of an express RFOA provision in the labor code while including the *Griggs* "business necessity" limitation; and his assertion that the labor code's age-discrimination provisions, unlike the ADEA, share common legislative and policy origins with those addressing other protected classes. Dearing does not seem to dispute that *Wards Cove* would govern proof of his claim. Instead, he contends that the labor code does not incorporate an RFOA limitation and that, if it does, the RFOA is an affirmative defense on which the Department would have the burdens of proof and persuasion.

We agree that *Dearing I* was clearly erroneous in its reliance on pre-*Smith* jurisprudence holding that disparate-impact claims were categorically unavailable under the ADEA. *See Chavana*, 993 S.W.2d at 315-17; *McCrea*, 769 S.W.2d at 262-63. However, we conclude that *Dearing I* was correct in its construction of section 21.122(b) of the labor code and that this provision was also intended to incorporate the ADEA's proof standards as interpreted by *Smith*— including the RFOA justification.

Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We seek to discern the legislature's intent, as manifested first and foremost in the statutory text. *Id.* We ascertain the legislature's intent from the plain meaning of the words chosen when possible. *Id.* To that end, we consider statutory language in context, not in isolation. *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1988); *see* Tex. Gov't Code Ann. § 311.011(a) (West 2005). We also presume that the legislature acted with knowledge of the background law. *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). Words and phrases that have acquired a technical or particular meaning shall be construed accordingly.

32

Tex. Gov't Code Ann. § 311.011(b). When ascertaining legislative intent, we may also consider the objective of the law, its history, and the consequences of a particular construction. *Id.*; *see also id.* § 311.023(1), (3), (5) (West 2005).

The Texas Supreme Court has frequently observed that the Texas Commission on Human Rights Act (TCHRA) and its current incarnation, chapter 21 of the labor code, were intended to "correlat[e] . . . state law with federal law in the area of discrimination in employment," *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991), and "coordinate and conform with federal law under Title VII . . . and the Age Discrimination in Employment Act." *Caballero v. Central Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993). The legislature, in fact, specified "general purposes" of the statute that include "provid[ing] for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section 2000e et. seq.),"[9] and "identify[ing] and creat[ing] an authority that meets the criteria under 42 U.S.C. Section 2000e-5(c) and 29 U.S.C. Section 633." Tex. Lab. Code Ann. § 21.001(1), (2). These federal provisions—contained within title VII and the ADEA, respectively—require that where a state has its own anti-discrimination laws and fair employment practices agency, the federal EEOC must defer its processing of a discrimination complaint for at least 60 days to permit the state agency to investigate and resolve it. Thus, the legislature created the Texas Human Rights Commission (now the Civil Rights Division of the Workforce Commission) to serve as Texas's

---

[9] A similar "general purpose" concerning disability discrimination was added in 1993: to "provide for the execution of the policies embodied in Title I of the Americans With Disabilities Act of 1990 and its subsequent amendments (42 U.S.C. Section 12101 et. seq)." Tex. Lab. Code Ann. § 21.001(3) (West 2006).

33

"deferral agency," i.e., one to which the EEOC would defer so the investigation and resolution of employment discrimination complaints could be handled at the state rather than federal level. *See Schroeder*, 813 S.W.2d at 485. A related concern, evident elsewhere in chapter 21 and throughout its legislative history, was to ensure that Texas anti-discrimination law conformed to federal law to whatever degree necessary to ensure that the Texas deferral agency would be recognized as such by the EEOC—and, importantly, could receive federal funding to help subsidize its operations.[10]

As Dearing emphasizes, much of chapter 21 appears to track title VII. Section 21.051, its general employment-discrimination prohibition, states:

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1)    fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

---

[10] To that end, the legislature went as far as to provide:

If a provision of this chapter is held by the Equal Employment Opportunity Commission to disqualify the commission as a deferral agency or for the receipt of federal funds, the commission shall administer this chapter to qualify for deferral status or the receipt of those funds until the legislature meets in its next session and has an opportunity to amend this chapter.

Tex. Lab. Code Ann. § 21.006 (West 2006); *see also* Fiscal Note, Tex. H.B. 14, 68th Leg., 1st C.S. (1983) (explaining that "EEOC provides grant monies to state and local governments with acceptable laws and regulations. . . . During the first year of operation, the State commission would receive $375 per charge resolution. If it meets the quality standards established by the U.S. Equal Employment Opportunity Commission in its performance, it would receive $412.50 per charge resolution beginning in its second year, and increases are anticipated in succeeding years.").

(2)     limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Lab. Code Ann. § 21.051.  Section 21.051 "is substantively identical to its federal equivalent in Title VII," but adds age and disability to the protected categories.  *Toennies*, 47 S.W.3d at 475; *cf.* 42 U.S.C.A. § 703(a).  Subsection (2) of section 21.051 tracks section 703(a)(2) of title VII, the provision that the United States Supreme Court has long identified as the textual basis for the disparate-impact liability theory.  *Smith*, 544 U.S. at 235 (citing *Watson*, 487 U.S. at 991).  Language parallel to section 703(a)(2) in the ADEA, the *Smith* court observed, "strongly suggests that a disparate-impact theory should be cognizable under the ADEA."  *Id*. at 236.  Furthermore, in codifying the *Griggs* "business necessity" concept, the legislature implicitly recognized the disparate-impact liability theory.  *See* Tex. Lab. Code Ann. § 21.115 ("An employer does not commit an unlawful employment practice by engaging in a practice that *has a discriminatory effect* and that would otherwise be prohibited . . . .") (emphasis added); *see also Helena Chem Co. v. Wilkins*, 47 S.W.3d 486, 497 (Tex. 2001) ("[W]hen the Legislature looks to another jurisdiction's statute, but modifies rather than adopts some of its provisions, it does so purposefully.").

However, the only provision in chapter 21 that explicitly addresses the availability of or burden of proof for disparate-impact employment-discrimination claims is section 21.122—and the only provision that specifically addresses such issues for disparate-impact age-discrimination claims is section 21.122(b).  The provision that is now section 21.122 was added to the TCHRA in 1993 as part of a package of amendments intended to conform the act to the 1991 Civil Rights Act

35

and the 1990 Americans With Disabilities Act. Act of May 14, 1993, 73d Leg., R.S., ch. 276, § 5, 1993 Tex. Gen. Laws 1285, (current version at Tex. Lab. Code Ann. § 21.122 (West 2006)). The legislature's desire to make Texas employment discrimination law consistent with its federal counterparts is repeatedly demonstrated in the text and structure of the amendments.[11]

The provision that is now section 21.122, with the exception of subsection (b), is substantively identical to the new section 703(k)(1) that Congress added to title VII in response to *Wards Cove*:

> Sec. 5.11. BURDEN OF PROOF IN DISPARATE IMPACT CASES. (a) An unlawful employment practice based on disparate impact is established under this Act only if:
>
> (1) a complainant demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, sex, national origin, religion, or disability and the respondent fails to demonstrate that the challenged practice is job-related for the position in question and consistent with business necessity; or
>
> (2) the complainant makes the demonstration in accordance with federal law as that law existed on June 4, 1989, with respect to the concept of alternative employment practices, and the respondent refuses to adopt such an alternative employment practice.

* * *

---

[11] We also note that the legislative record reflects an understanding by bill proponents that "[w]ith the passage of the Civil Rights Act of 1991 and the Americans With Disabilities Act, it is necessary to amend the Commission on Human Rights Act to be equivalent to these two federal laws in order to maintain the current relationship between the Commission on Human Rights and the U.S. Equal Employment Opportunity Commission." House Comm. On State Affairs, Bill Analysis, Tex. H.B. 860, 73d Leg. R.S. (1993).

(c) To demonstrate that a particular employment practice causes a disparate impact, the complainant must demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complainant demonstrates to the satisfaction of the court that the elements of a respondent's decision-making process are not capable of separation for analysis, that decision-making process may be analyzed as one employment practice.

(d) If the respondent demonstrates that a specific practice does not cause a disparate impact, the respondent may not be required to demonstrate that the practice is consistent with business necessity.

Act of May 14, 1993, 73d Leg., R.S., ch. 276, § 5, 1993 Tex. Gen. Laws 1285, 1287-88 (current version at Tex. Lab. Code Ann. § 21.122 (West 2006)); *cf.* 42 U.S.C.A § 2000e-2(k)(1). Other portions of new subsection (k) were also replicated in the TCHRA, including a provision clarifying that "[a] demonstration that an employment practice is consistent with business necessity may not be used as a defense under this Act against a complaint of intentional discrimination." Act of May 14, 1993, 73d Leg., R.S., ch. 276, § 5, 1993 Tex. Gen. Laws 1285, 1288 (current version at Tex. Lab. Code Ann. § 21.123 (West 2006)); *cf.* 42 U.S.C.A. § 2000e-2(k)(2) (West 2003). But the amendments did not track only federal changes that tended to expand liability exposure. To the contrary, the legislature also incorporated portions of subsection (k) and the 1991 act that limited employers' liability. These included a new liability protection regarding employers' anti-drug policies, Act of May 14, 1993, 73d Leg., R.S., ch. 276, § 4, 1993 Tex. Gen. Laws 1285, 1887 (current version at Tex. Lab. Code Ann. § 21.120 (West 2006)); *cf.* 42 U.S.C.A. § 2000e-2(k)(3) (West 2003), and a prohibition on damage awards, back pay, and reinstatement in certain mixed-motive cases. Act of May 14, 1993, 73d Leg., R.S., ch. 276, § 5, 1993 Tex. Gen. Laws 1285, 1288

(current version at Tex. Lab. Code Ann. § 21.125 (West 2006)); *cf.* 42 U.S.C.A. §§ 2000e-2(m), 2000e-5(g)(2)(B) (West 2003).

As noted in *Smith*, Congress did not make changes to the ADEA corresponding to the new section 703(k) it added to Title VII.  In keeping with its intent to retain consistency with federal law, the legislature, as this Court observed in *Dearing I*, "specifically mirrored" this "textual distinction between the ADEA and Title VII" by adopting "the language added to Title VII in 1991 [but] treat[ing] disparate impact on the basis of age distinctly by removing it from the list of other forms of discrimination that give rise to disparate-impact liability."  150 S.W.3d at 465.  The legislature provided in subsection (b) of section 21.122 that, "To determine the availability of and burden of proof applicable to a disparate impact case involving age discrimination, the court shall apply the judicial interpretation of the Age Discrimination in Employment Act of 1967 and its subsequent amendments (29 U.S.C. Section 621 et seq.)."  Tex. Lab. Code Ann. § 21.122(b).

Ultimately, the parties' dispute over the construction of section 21.122(b) turns on the meaning of the "*judicial interpretation* of the Age Discrimination in Employment Act of 1967 and its subsequent amendments" that we "shall apply" to "determine the availability of and burden of proof applicable to a disparate impact case involving age discrimination."  Dearing maintains that the relevant ADEA "judicial interpretation" in *Smith* that we must apply "is simply the *analysis* of a provision of the federal statute that exists nowhere in the Texas Labor Code," and that is therefore distinguishable.  The Department contends that section 21.122(b) requires us to follow *Smith's holdings* regarding the availability and burden of proof for ADEA disparate-impact

claims—including the portions of the court's analysis that reference the RFOA provision. As in *Dearing I*, we agree with the Department's construction of section 21.122(b).

The legislature manifested its intent throughout the 1993 amendments to the TCHRA that Texas employment-discrimination law conform to federal law in the aftermath of the 1991 Civil Rights Act. The conforming changes that the legislature made included not only those expanding liability exposure, but also those restricting it. The legislature added a new provision specifically to address the availability and burden of proof in disparate-impact claims and, like Congress, chose to treat age-discrimination claims differently from those involving other protected classes. The federal analogue that the legislature identified for age-discrimination claims, moreover, was not title VII, but the "judicial interpretation of the Age Discrimination in Employment Act of 1967 and its subsequent amendments."

If, as Dearing contends, the legislature had intended that Texas courts "apply" the ADEA "judicial interpretation" only to the extent that the ADEA is textually parallel to the TCHRA, it would have undermined its own manifest goal to restore consistency between Texas and federal employment-discrimination law. By the time of the 1993 amendments, as noted, there was already considerable jurisprudential controversy regarding the availability of disparate-impact claims under the ADEA, with the RFOA provision and other distinguishing features of the ADEA being focal points of the debate. *See Markham*, 451 U.S. 945 (Rehnquist, J., dissenting from denial of certiorari); *Metz*, 828 F.2d at 1216-20; *see generally* Herbert & Shelton, *supra*, at 636-50. While the 1993 TCHRA amendments were pending before the legislature, furthermore, the Supreme Court handed down its *Hazen Paper* decision, which was viewed by many as validating the arguments

being made against disparate-impact claims under the ADEA. We presume that the legislature is aware of the background law when it enacts a statute. *Acker*, 790 S.W.2d at 301. Especially given the jurisprudential environment that existed at the time of the 1993 amendments, it is doubtful that a legislature intending to keep Texas employment-discrimination law consistent with its federal counterpart would require Texas courts to apply ADEA "judicial interpretation" while contemplating that these cases could be deemed distinguishable and inapplicable. Such inconsistency would have been further compounded by the legislature's unequivocal mandate that courts apply the "judicial interpretation of the Age Discrimination in Employment Act of 1967 *and its subsequent amendments*," without regard to whether those future amendments might be consistent with the TCHRA.

Considering, as we must, the role of section 21.122(b) in context with the 1993 TCHRA amendments as a whole, *see Jones*, 969 S.W.2d at 432, the more plausible construction of "*judicial interpretation* of the Age Discrimination in Employment Act of 1967 and its subsequent amendments" is that we apply the authoritative holdings governing availability and burden of proof for ADEA disparate-impact claims as the standards governing the same issues for such claims under the labor code, without regard to what might otherwise be distinguishing differences in the underlying statutory texts. What the legislature intended in section 21.122(b), in other words, was for Texas law to track federal law regarding the availability of and burden of proof in disparate-impact age-discrimination cases, in effect incorporating not only the ADEA's textual features presently governing those issues, but even their "subsequent amendments." This conclusion is consistent with *Dearing I*'s construction of section 21.122(b). Similarly, while Dearing's arguments

40

emphasize textual parallels between the THCRA and title VII that might have been significant if considered in isolation, we agree with the *Dearing I* Court that Dearing "would have us ignore section 21.122" and its impact. *Dearing I*, 150 S.W.3d at 465.

Consequently, Dearing must establish a prima facie case under the standards of *Wards Cove,* and the Department may invoke the RFOA limitation, as interpreted in *Smith*, as a justification. We are also persuaded by the prevailing post-*Smith* case law that the RFOA provision must operate in the same way as the business-necessity justification under *Wards Cove*; that is, the Department has the initial burden of production regarding this justification, but Dearing retains the ultimate burden of proof to demonstrate that any proffered RFOA was unreasonable. *See Meacham v. Knolls Atomic Power Lab*., 461 F.3d 134, 141-43 & n.7 (2d Cir. 2006) (noting that in *Smith*, Supreme Court stated that bona fide occupational qualification was affirmative defense but did not similarly identify RFOA as affirmative defense and further, it is "hard to see how an ADEA plaintiff can expect to prevail on a showing of disparate impact based on a factor that correlates with age without also demonstrating that the factor is unreasonable."); *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1200 (10th Cir. 2006) (holding that "to prevail on an ADEA disparate impact claim, an employee must ultimately persuade the factfinder that the employer's asserted basis for the neutral policy is unreasonable."); *Durante v. Qualcomm, Inc*., 144 Fed. Appx. 603, 607 (9th Cir. 2005) (ruling in favor of employer that produced "unrebutted evidence" that its termination decisions were made to satisfy differing business needs of its divisions and departments); *see also Marshall v. Westinghouse Elec. Corp*., 576 F.2d 588, 590 (5th Cir. 1978) ("This circuit has consistently held that once the plaintiff makes out such a prima facie case the defendant bears the burden of 'going

forward' to demonstrate reasonable factors other than age for the plaintiff's discharge. Just as consistently we have said that the burden of persuasion, often called the risk of non-persuasion, never shifts; it remains upon the ADEA plaintiff."). Dearing relies on three cases, none of which address *Wards Cove*, to argue that the RFOA is an affirmative defense on which the Department has the burden of persuasion. *See Johnson v. Perkins Rests., Inc.*, 815 F.2d 1220, 1221 (8th Cir. 1987); *Criswell v. Western Airlines, Inc.*, 709 F.2d 544, 552 (9th Cir. 1983); *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 87 (2000) (discussing bona fide occupational qualification as affirmative defense). All of these cases, moreover, preceded the Supreme Court's opinion in *Smith.*

Because the district court's trial plan does not sufficiently address these elements, it abused its discretion in certifying the class. We sustain the Department's second and third issues.

### *The Department's jurisdictional arguments*

In its fourth issue, the Department adds that under *Smith*'s requirements, as incorporated into the labor code through section 21.122(b), Dearing has not pleaded, and cannot plead, a valid claim for disparate-impact age-discrimination, rendering his claim not viable, *see Lopez*, 156 S.W.3d at 557, and barred by sovereign immunity. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)); *see also* Tex. Lab. Code Ann. § 21.002(8)(D) (West 2006). The Department relies on challenges to both the sufficiency of Dearing's pleading allegations and underlying jurisdictional facts. *See Miranda*, 133 S.W.3d at 227 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)). To that end, it asks us to consider the evidence it attached to its pre-*Smith*, pre-certification plea to the jurisdiction, summary-judgment motions,

and special exceptions. While styling these arguments as challenges to class certification, the Department also asks us to dismiss Dearing's claim for want of subject-matter jurisdiction, or at least remand to afford him the opportunity to replead in accordance with *Smith*. *See Miranda*, 133 S.W.3d at 226-27.

The Department acknowledges that "the parties [have] not address[ed] the jurisdictional issues" in the district court after *Smith* "or the propriety of Plaintiffs' attempts to certify a class based [on] pleadings that do not mention *Smith*'s requirements." It attributes the context in which it has raised these jurisdictional issues to the limited scope of our *Dearing I* mandate, observing that the "remand proceedings only involved the propriety of re-certifying the class." Nonetheless, the Department urges that because these issues implicate sovereign immunity and, therefore, subject-matter jurisdiction, we may address them for the first time on appeal. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

In effect, the Department is seeking to re-urge, in light of *Smith*, its pre-*Smith* plea to the jurisdiction augmented by new challenges to jurisdictional facts that it seeks to raise for the first time on appeal. This Court recently held that where a defendant's challenge to jurisdictional facts also implicates the merits of a plaintiff's claim, *Miranda* requires that the challenge be raised first in the trial court rather than on appeal. *Hendee v. Dewhurst*, ___ S.W.3d ___, ___, No. 03-06-00501-CV, 2007 Tex. App. LEXIS 4149, at*53-54 (Tex. App.—Austin May 25, 2007, pet denied) (op. on reh'g). That is the case here—the Department seeks to conclusively establish that it relied on an RFOA, which, if successful, would bar liability for any disparate effects of the reclassifications that Dearing challenges.

43

Nor can we reach these dispositive issues in the guise of determining the "viability" of Dearing's class claims. The supreme court has instructed us that "dispositive issues should be resolved by the *trial* court before certification is considered." *Lopez*, 156 S.W.3d at 557 (emphasis added). Contrary to the Department's suggestions, *Lopez* does not create a new procedural means by which appellate courts can adjudicate the merits of dispositive issues not otherwise within their jurisdiction to consider. Instead, it envisions that such issues should be adjudicated in the trial court in the first instance, through the established procedural mechanisms under our rules—such as pleas to the jurisdiction, summary-judgment motions, and special exceptions—rather than by what are substantively the same proceedings initiated at the appellate level. *Cf. Lopez*, 156 S.W.3d at 157 (declining to reach viability issues and remanding so trial court could address pending plea to the jurisdiction and special exceptions).

Furthermore, the concept of viability addressed in *Lopez* emanates from the core requirement that, before certification, trial courts perform a "rigorous analysis" to determine whether rule 42's requirements are met. *Bernal*, 22 S.W.3d at 435. To "make a meaningful determination of the certification issues," *Peake*, 178 S.W.3d at 778, trial courts must resolve disputes affecting the underlying substantive law prior to certification because "courts can hardly evaluate the claims, defenses or applicable law without knowing what the law is." *Lapray*, 135 S.W.3d at 672. The impact of recent cases affecting the controlling law must be considered. *Hankins*, 111 S.W.3d at 72. The district court's trial plan does not reflect any consideration of *Smith*'s implications for Dearing's claim, beyond allowing the claim (in derogation of our mandate) to proceed on a class basis. In fact, the court's re-certification order merely attached and incorporated a trial plan that predated *Smith*.

44

Even under the view of *Smith*'s effects accepted by Dearing, the trial plan falls short. For example, the elements for establishing a prima facie case under *Wards Cove* are not addressed, nor is the burden-shifting framework it requires.[12]

The Department will have the opportunity on remand to re-urge its dispositive motions in light of *Smith*. Conversely, Dearing will have the opportunity to amend his pleadings and otherwise respond to the Department's potentially dispositive issues under the normal procedural framework that our rules provide to protect and balance the interests of both plaintiffs and defendants. *Cf. Hendee*, ___S.W.3d at ___, 2007 Tex. App. LEXIS 4149, at *53-54. The district court's disposition of those issues, in turn, will inform its "rigorous analysis" of whether the class should be certified. We overrule the Department's fourth issue.

### Single-filing rule

In its fifth issue, the Department argues that we should revisit, as "clearly erroneous," *Dearing I*'s holding that the claims of putative class members other than Dearing were not barred by their failure to exhaust administrative remedies. The supreme court has held that the provisions now codified in chapter 21 of the labor code, like title VII, impose a comprehensive and exclusive administrative scheme under which employment-discrimination claimants must first exhaust their

---

[12] E.g., how Dearing's statistical proof of disparate impact will be proved and evaluated—specifically, against what other group Dearing's claims will be measured to test for disparate impact.

Dearing observes that the district court did not enter findings of fact and conclusions of law and that ordinarily we would presume that the district court made any fact findings supported by the evidence that were necessary for any legal theory that could support its order. However, "actual, not presumed, conformance" with rule 42 is required. *Bernal*, 22 S.W.3d at 435.

remedies before filing a civil action. *Schroeder*, 813 S.W.2d at 486-88. Failure to exhaust these remedies is a jurisdictional bar to suit. *Id.* at 488. In the district court, the Department, in support of its plea to the jurisdiction, presented undisputed evidence that no class member other than Milburn Dearing had filed a complaint with the human rights commission. In affirming the district court's denial of the plea in *Dearing I,* this Court purported to "adopt the single-filing rule fashioned by federal courts" whereby similarly-situated persons can, under certain circumstances, "piggyback" onto a single plaintiff's filing of an EEOC complaint under title VII or the ADEA. *Dearing I,* 150 S.W.3d at 460; *see Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1223 (5th Cir. 1995).[13] We agree with the Department that *Dearing I*'s analysis of the single filing issue should be reexamined, a conclusion that the concurrence shares. ___ S.W.3d at ___ (Waldrop, J., concurring).[14]

Dearing I's "adoption" of the single-filing rule was predicated principally on (1) a view that "a person's 'agent' could reasonably include a class representative" under section 21.201

---

[13] As the Fifth Circuit explained this concept, in the context of the ADEA:

The federal courts now universally hold that an individual who has not filed an administrative charge can opt-in to a suit filed by any similarly situated plaintiff under certain conditions. This so-called "single filing rule" generally allows a plaintiff, who did not file an EEOC charge, to piggyback on the EEOC complaint filed by another person who is similarly situated. . . . The policy behind the single filing rule is that it would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC. As long as the EEOC and the company are aware of the nature and scope of the allegations, the purposes behind the filing requirement are satisfied and no injustice or contravention of congressional intent occurs by allowing piggybacking.

*Mooney,* 54 F.3d at 1223.

[14] We decline to revisit the Court's prior holding regarding the timeliness of Milburn Dearing's administrative complaint, however.

of the labor code; and (2) what the Court regarded as the beneficial policies served by the rule in federal courts. 150 S.W.3d at 460. We agree with the concurrence that Texas courts are not in a position to incorporate extra-statutory requirements into the labor code. ___ S.W.3d ___ (Waldrop, J., concurring). Our proper inquiry is, instead, to ascertain the policies that the legislature intended to advance in the labor code, as manifested first and foremost by the statutory text, and as further discerned through our application of the established statutory construction principles we have reviewed above.

Section 21.201 provides that "a person claiming to be aggrieved by an unlawful employment practice *or the person's agent* may file a complaint with the commission." Tex. Lab. Code Ann. § 21.201 (West 2006) (emphasis added). As the Department observes, "agent" under Texas law ordinarily denotes a relationship based upon a principal's manifested consent that the agent act on his behalf. *See Bhalli v. Methodist Hosp.*, 896 S.W.2d 207, 210 (Tex. App.—Houston [1st Dist.] 1995, writ denied). Under traditional agency principles, as the Department suggests, a class representative "filing the complaint is not necessarily in an agency relationship with the other members of the purported class." Indeed, especially in the early stages of litigation, members of the putative class will frequently have no knowledge of their purported representative's actions. *See* Tex. R. Civ. P. 42(c)(2)(B), (e)(3)-(4). Thus, the Department suggests, section 21.201 could not have been intended to allow class-wide exhaustion of administrative remedies through a single filing, absent pleadings and proof establishing that the filer was acting as an agent of each class member.

This intent, the Department argues, is further demonstrated by comparing section 21.201 to the administrative-exhaustion requirements of the ADEA. As originally enacted, the

47

ADEA provided that "[n]o civil action may be commenced by any individual under this section until *the individual* has given the Secretary [of Labor] not less than sixty days' notice of an intent to file such action." Age Discrimination in Employment Act of 1967, Pub. L. No. 202, § 7(d), 81 Stat. 602, 605 (current version at 29 U.S.C.A. § 626(d) (West 1998)) (emphasis added). In 1978, Congress amended this provision into its current form: "No civil action may be commenced by an individual under this section until 60 days after *a charge* alleging unlawful discrimination has been filed [with the EEOC]." Age Discrimination in Employment Act Amendements of 1978, Pub. L. No. 95-256, § 4(b) 92 Stat. 189, 190 (current version at U.S.C.A. § 626(d)) (West 1998) (emphasis added). The Department suggests that Congress amended the ADEA specifically to permit class actions under the single-filing rule, and there is some support for this view. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1056 (2d Cir. 1990). Although not disputing that "[t]he federal courts now universally hold that an individual who has not filed an administrative charge can opt-in to a suit filed by a similarly situated plaintiff" under the single-filing rule, *see Mooney*, 54 F.3d at 1223, the Department attributes these developments to the 1978 ADEA amendments, and distinguishes section 21.201 on that basis.

We conclude, however, that section 21.201's closer federal analogue is section 706(b) of title VII. *See* 42 U.S.C.A. § 2000e-5(b). As the Texas Supreme Court observed in *Schroeder*, the employment-discrimination provisions of the labor code, like title VII, do not contain an explicit exhaustion-of-remedies requirement similar to the ADEA's. 813 S.W.2d at 487 & n.9. Instead, the court determined that the overall structure of the Texas administrative procedures resembled those of title VII, observed that the United States Supreme Court had held that title VII's provision

48

required exhaustion of remedies, emphasized the legislature's explicit intent to provide for the execution of title VII's policies and concluded that the Texas law imposes an administrative-exhaustion requirement akin to title VII. *Id.* at 487.

Section 706(d) of title VII resembles section 21.201 of the labor code. It provides that a "charge" satisfying title VII's administrative-exhaustion requirements can be "filed by or on behalf of a person claiming to be aggrieved." 42 U.S.C.A.§ 2000e-5(b). The phrase "or on behalf of" was added in the Equal Employment Opportunity Act of 1972. *See* Pub. L. No. 92-261, sec. 4(a), § 706(a)-(g), 86 Stat. 103, 104. As originally enacted in 1964, section 706 had stated that a "charge" is filed only "by a person claiming to be aggrieved." Civil Rights Act of 1964, Pub. L. 88-352, § 706(a), 78 Stat. 241, 259. Even before the 1972 amendment, federal courts had recognized the single-filing rule under section 706. *See Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 497-99 (5th Cir. 1968); *see also Albermarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975) (noting that "[t]he Courts of Appeals . . . are unanimous in recognizing that backpay may be awarded on a class basis under Title VII without exhaustion of administrative procedures by the unnamed class members" and suggesting that "Congress plainly ratified this construction of the Act in the course of enacting the Equal Employment Opportunity Act of 1972").

The similarities between the labor code's administrative provisions and those of title VII, like others throughout each statute, *cf. Toennies*, 47 S.W.3d at 475, reflect the legislature's intent to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (42 U.S.C. Section 2000e et. seq.)" in regard to exhaustion of administrative remedies. *Schroeder*, 813 S.W.2d at 486-88. Both before and after the 1983 enactment of the

TCHRA, the single-filing rule was well-established in title VII cases.[15]  Although the concurrence states a reasonable view of the statutory language if viewed in isolation, we are to presume that the legislature was aware of the jurisprudential context in which it drafted the TCHRA and its implications for the statutory words and structure it chose.  *See Acker*, 790 S.W.2d at 301.

We conclude that the labor code manifests the legislature's intent to incorporate the single-filing rule from title VII jurisprudence.  As we explained in *Dearing I,* the single-filing rule allows a person who has not filed an administrative charge to piggyback on another party's timely-filed administrative charge, if the person attempting to piggyback is similarly situated to the person who actually filed the administrative charge, and the charge provides notice of the collective or class-wide nature of the charge.  150 S.W.3d at 460.  Here the plaintiffs are similarly situated to Dearing for the purposes of the single-filing rule because they all share the same grievance:  that the Department's reclassification of the former Field Sergeant Game Wardens from the C-7 to the C-6 level constituted unlawful age discrimination that had a disparate-impact on employees over the age of forty.  *See Crawford*, 660 F.2d at 665 (holding that plaintiffs were "similarly situated" for purposes of single-filing rule because "the gravamen of their complaints"—that they were given improper seniority dates and passed over for promotion because of their race—was "the same"); *Oatis*, 398 F.2d at 498 (noting that where employees all had same grievance "it would be wasteful, if not vain" to require each employee to process identical complaints with EEOC).  Furthermore, Dearing's charge gave notice of the class-wide nature of the charge.  We thus agree with *Dearing*

---

[15] *See Price v. Choctaw Glove & Safety Co.,* 459 F.3d 595, 598-99 (5th Cir. 2006); *Crawford v. U.S. Steel Corp.*, 660 F.2d 663, 665 (5th Cir. 1981); *Wheeler v. American Home Products Corp.*, 582 F.2d 891, 897-98 (5th Cir. 1977); *Oatis*, 398 F.2d at 499.

*I*'s ultimate holding that the single-filing rule applies to Milburn Dearing's complaint and that his complaint adequately stated its class-action intent. 150 S.W.3d at 460. We overrule the Department's fifth issue.

**Other certification issues**

Because *Smith*'s impact on Dearing's claim and the Department's defenses will be integral to the district court's consideration of class certification on remand, we will defer further analysis of the propriety of certification until that issue is again before us. Nonetheless, we observe that the district court order reinstated, without modification, a certification order that predated the October 2003 amendments to rule 42, and that does not comply with the amended rule. *See* Tex. R. Civ. P. 42(c)(1)(D). Among other defects, the plan fails to state the other available methods of adjudication or adequately explain why a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *See* Tex. R. Civ. P. 42(b)(3), (c)(1)(D). In particular, we observe that of the approximately 130 members of the putative class, eighty-eight have already joined as plaintiffs. Finally, we note that the trial plan purports to set discovery deadlines and a trial date in 2003. We trust that if the district court reaches the issue of certification again on remand, it will comply with amended rule 42.

**CONCLUSION**

We reverse the district court's order reinstating its prior class-certification order. On remand, the parties will have the opportunity to address the impact of *Smith* and this decision on the adequacy of their pleadings, the district court's subject-matter jurisdiction, and any other dispositive

51

matters.  The parties will then have the opportunity to address the impact of these rulings and *Smith* on certification.  We remand these issues to the district court for further proceedings consistent with this opinion.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop;
    Concurring Opinion by Justice Waldrop

Reversed and Remanded

Filed:   August 3, 2007